1   John D. Fiero (CA Bar No. 136557)
Kenneth H. Brown (CA Bar No. 100396)
2   Teddy M. Kapur (CA Bar No. 242486)
PACHULSKI STANG ZIEHL & JONES LLP
3   150 California Street, 15th Floor
San Francisco, California 94111-4500
4   Telephone: 415/263-7000
Facsimile: 415/263-7010
5   E-mail: jfiero@pszjlaw.com
        kbrown@pszjlaw.com
6         tkapur@pszjlaw.com

7   Attorneys for Heller Ehrman LLP,
Debtor and Debtor in Possession

8

9   Steven H. Felderstein (CA Bar No. 56978)
Thomas A. Willoughby (CA Bar No. 137597)
Jason Rios (CA Bar No. 190086)
10   Christopher Crowell (CA Bar No. 253103)
FELDERSTEIN FITZGERALD WILLOUGHBY &
11   PASCUZZI LLP
400 Capitol Mall, Suite 1450
12   Sacramento, CA 95814
Telephone: (916) 329-7400
13   Facsimile: (916) 329-7435

14   Attorneys for The Committee of Unsecured Creditors

15              **UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
16                 **SAN FRANCISCO DIVISION**

<div style="margin-left:2em; font-style:italic">(left margin vertical text) PACHULSKI STANG ZIEHL & JONES LLP — ATTORNEYS AT LAW — SAN FRANCISCO, CALIFORNIA</div>

| 17   In re: | Case No.: 08-32514 |
|---|---|
| 18   **HELLER EHRMAN LLP**, | Chapter 11 |
| 19            Debtor. | **DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF LIQUIDATION OF HELLER EHRMAN LLP (MAY 14, 2010)** |
| 20 | |
| 21 | **Confirmation Hearing** |
| 22 | Date: July 6, 2010 |
| | Time: 1:30 p.m. |
| 23 | |
| 24 | Place: United States Bankruptcy Court |
| | 235 Pine Street, 22nd Floor |
| 25 | San Francisco, CA |
| | Judge: Honorable Dennis Montali |

26

27

28

# TABLE OF CONTENTS

| | | | | Page |
|---|---|---|---|---|
| I. | INTRODUCTION | | | 1 |
| | A. | Introduction | | 1 |
| | B. | Information Regarding the Plan | | 2 |
| | | 1. | Plan Governing Document | 2 |
| | | 2. | Source of Information | 2 |
| | | 3. | Warning Regarding Federal and State Income Tax Consequences of the Plan | 3 |
| | | 4. | Bankruptcy Court Approval | 3 |
| | C. | Voting Instructions | | 3 |
| | | 1. | How to Vote | 3 |
| | | 2. | Who May Vote | 4 |
| | D. | Confirmation | | 4 |
| | E. | Disclaimers | | 6 |
| II. | PLAN OVERVIEW | | | 7 |
| | A. | Introduction | | 7 |
| | B. | Treatment of Claims | | 8 |
| III. | OVERVIEW OF CHAPTER 11 CASE | | | 16 |
| | A. | Events Leading Up to the Filing of the Chapter 11 Case | | 16 |
| | | 1. | Description of the Debtor | 16 |
| | | 2. | The Debtor's Pre-Petition Credit Facility | 17 |
| | | 3. | Events Precipitating the Debtor's Filing | 19 |
| | B. | Summary of Events During the Chapter 11 Case | | 21 |
| | | 1. | "First Day" Pleadings | 21 |
| | | 2. | Filing of Schedules, Meeting of Creditors and Bar Date | 22 |
| | | 3. | The Official Committee of Unsecured Creditors | 22 |
| | | 4. | Retention of Professionals | 22 |
| | | 5. | Entry of Key Employee Retention Plan Order | 24 |
| | | 6. | Disposition of Unexpired Real Property Leases | 24 |
| | | 7. | Client File Disposition Procedures | 25 |
| | | 8. | Authorization of Committee to Pursue Certain Estate Causes of Action | 25 |
| | | 9. | The Joint Investigation Agreement | 26 |
| | | 10. | Wind Down of the Retirement Plan | 27 |
| | | 11. | The Biggers Adversary Proceeding and Settlement | 29 |
| | | 12. | Other Postpetition Activities | 35 |
| IV. | IDENTIFICATION OF LITIGATION CLAIMS | | | 36 |

Pachulski Stang Ziehl & Jones LLP
Attorneys at Law
San Francisco, California

| | | | |
|---|---|---|---|
| A. | The Bank of America Preference Action | ....................... | 36 |
| B. | Former Shareholder Settlement Process | ....................... | 38 |
| C. | Intellectual Property Contingent Fee Representation of Ronald A Katz Technology Licensing LP; and A2D Licensing Technology LP ("Katz") | ....................... | 48 |
| D. | Potential lawsuit against certain Former Shareholders who practiced in the Intellectual Property portion of the Debtor. | ....................... | 49 |
| E. | Potential lawsuit against Covington & Burling LLP and possibly others | ....................... | 50 |
| F. | Potential lawsuit against Greenberg Traurig, LLP | ....................... | 51 |
| G. | Potential lawsuit against Ernst & Young | ....................... | 53 |
| H. | Claims to profits from unfinished business and business opportunities | ....................... | 55 |
| I. | Qualcomm | ....................... | 56 |
| J. | Preservation of Other Causes of Action | ....................... | 56 |

**V. SUMMARY DESCRIPTION OF THE PLAN** ....................... 57

| | | | |
|---|---|---|---|
| A. | Description Of Classes | ....................... | 58 |
| | 1. | Class 1 Claims. | 58 |
| | 2. | Class 2 Claims. | 58 |
| | 3. | Class 3 Claims. | 58 |
| | 4. | Class 4 Claims. | 58 |
| | 5. | Class 5 Claims. | 58 |
| | 6. | Class 6 Claims. | 58 |
| | 7. | Class 7 Claims. | 58 |
| | 8. | Class 8 Claims. | 58 |
| | 9. | Class 9 Claims. | 58 |
| | 10. | Class 10 Interests. | 58 |
| B. | Treatment Of Unclassified Claims | ....................... | 58 |
| | 1. | Administrative Claims. | 58 |
| | 2. | Administrative Claims (Professionals). | 59 |
| | 3. | Priority Tax Claims. | 59 |
| C. | Treatment of Classified Claims and Interests | ....................... | 60 |
| | 1. | Secured Claims. | 60 |
| | 2. | Unsecured Claims. | 60 |
| | 3. | Class 10 (Interest Holders) | 64 |
| D. | Implementation of the Plan. | ....................... | 64 |
| E. | Executory Contracts. | ....................... | 65 |
| F. | Conditions to Confirmation of the Plan. | ....................... | 65 |
| G. | Effects of Confirmation. | ....................... | 65 |
| H. | Sources of Funding for the Plan. | ....................... | 66 |
| I. | Post Effective Date Employment and Compensation of Professionals. | ....................... | 67 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

SF:66893.001/DOCS_SF:67479.20

ii

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

000003

|  |  |  |  |
|---|---|---|---|
| | J. | Certain Death Benefits | 68 |
| | K. | Section 105 Injunction | 68 |
| VI. | TAX DISCLOSURE | | 69 |
| | A. | Tax Consequences to the Liquidating Debtor | 70 |
| | B. | Tax Consequences To Creditors | 70 |
| | C. | Tax Consequences to Holders of Interests | 70 |
| VII. | LIQUIDATION ANALYSIS | | 71 |
| VIII. | RISK ANALYSIS | | 73 |
| IX. | FEASIBILITY | | 74 |
| X. | CONFIRMATION OF THE PLAN | | 74 |
| XI. | RECOMMENDATION AND CONCLUSION | | 75 |

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

000004

**Exhibits**

| | |
|---|---|
| **Exhibit A** | **Plan** |
| **Exhibit B** | **Post Confirmation Budget** |
| **Exhibit C** | **Sources and Uses at Confirmation** |
| **Exhibit D** | **Liquidation Analysis** |
| **Exhibit E** | **Schedule of Approved Cure Obligations** |

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

iv

# I.

# INTRODUCTION

## A.     Introduction

On December 28, 2008 (the "Petition Date"), Heller Ehrman LLP (the "Debtor"),

commenced the above-captioned bankruptcy case by filing a voluntary petition under chapter 11 of

title 11 of the United States Code (the "Bankruptcy Code").  The Debtor's case is being administered

in the United States Bankruptcy Court for the Northern District of California, San Francisco

Division, before the Honorable Dennis Montali.

This Disclosure Statement (the "Disclosure Statement") contains information with respect to

the plan of reorganization (the "Plan") proposed by the Debtor and the Committee of Unsecured

Creditors (the "Committee," and together with the Debtor, the "Proponents").  A copy of the Plan is

attached hereto as **Exhibit A**. Except as otherwise provided herein, capitalized terms used in this

Disclosure Statement shall have the meanings set forth in the Plan.  (See Plan at Article I

(Definitions)).

Pursuant to section 1125 of the Bankruptcy Code, this Disclosure Statement is being

distributed to you for the purpose of enabling you to make an informed judgment about the Plan.

The Debtor and the Committee have examined various alternatives and, based on information

contained in this Disclosure Statement, and for the reasons set forth below, have concluded that the

Plan provides the best recovery to creditors and, depending on the ultimate outcome of litigation and

the allowance or disallowance of the Claims, it could result in a dividend of as much as 68% to Class

7 General Unsecured Creditors.

The Disclosure Statement describes the Plan and contains information concerning, among

other matters:  (1) the history, business, results of operations, management, properties and liabilities

of the Debtor; (2) the proposed wind down of the Debtor and liquidation of its remaining receivables

and claims pursuant to the terms of the Plan, and (3) the proposed distribution to Creditors and

holders of Claims against the Debtor.  The Proponents request that you carefully review the contents

of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 08-32514    Doc# 1153    Filed: 05/25/10    Entered: 05/25/10 14:07:51    Page 6 of
80
36869-001\DOCS_SF:67493.07                                    1                    DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

000006

to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

Your vote on the Plan is important. In order for the Plan to be accepted by a Class of Claims or Interests, the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Allowed Claims or Interests in such Class who vote on the Plan must vote to accept it.

Non-acceptance of the Plan may lead to a liquidation under chapter 7 of the Bankruptcy Code, or to the confirmation of another plan. These alternatives may not provide for a distribution of as much value to holders of Allowed Claims and Interests as the Plan. Accordingly, the Proponents urge you to accept the Plan by completing and returning the enclosed ballot no later than 5:00 p.m. on June 16, 2010.

### B.    Information Regarding the Plan

#### 1.    Plan Governing Document

Although the Proponents believe that this Disclosure Statement accurately describes the Plan, all summaries of the Plan contained in this Disclosure Statement are qualified by the Plan itself and the documents described therein which are controlling. You are urged to read the Plan and not just this Disclosure Statement.

#### 2.    Source of Information

Factual information, including all financial information contained in this Disclosure Statement, has been provided by the Debtor, the Committee, or their professionals, or has been obtained from the Debtor's records, except where otherwise specifically noted. None of the Proponents' attorneys, accountants or other professionals make any representation regarding that information. The Debtor does not represent or warrant that the information contained in this Disclosure Statement is free from any inaccuracy. The Debtor has, however, attempted to present the information accurately and fairly, and the Debtor believes that the information is substantially accurate. The assumptions underlying the projections contained in this Disclosure Statement concerning the sources and amounts of payments to Creditors and Interest Holders represent the Debtor's best estimate as to what it expects will happen. Because they are only assumptions about or predictions of future events, many of which are beyond the Debtor's control, there can be no

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

36894-001\DOCS_SF:67493.2

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

Case 98-32514   Doc# 1153   Filed: 05/25/10   Entered: 05/25/10 14:07:51   Page 7 of
80

000007

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

assurances that the assumptions will in fact materialize or that the projected realizations will in fact be met. Except as otherwise provided herein, this Disclosure Statement will not reflect any events that occurred after the hearing before the Bankruptcy Court to determine the adequacy of the Disclosure Statement.

> **3.** **Warning Regarding Federal and State Income Tax Consequences of the Plan**

The tax consequences of the Plan will vary based on the individual circumstances of each holder of a Claim. Accordingly, each Creditor and Interest Holder is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

> **4.** **Bankruptcy Court Approval**

Following a hearing held on May 14, 2010, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor to make an informed judgment about the Plan. Under section 1125 of the Bankruptcy Code, this approval enabled the Proponents to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not, however, approved the Plan itself, nor conducted a detailed investigation into the contents of this Disclosure Statement.

**C.** **Voting Instructions**

> **1.** **How to Vote**

A ballot is enclosed herewith for Creditors and Interest Holders to use in voting on the Plan. To vote on the Plan, indicate on the enclosed ballot that you accept or you reject the Plan and sign your name and mail the ballot in the envelope provided for this purpose.

**In order to be counted, ballots must be completed, signed and returned so that they are received no later than 5:00 P.M. prevailing Pacific Time on June 16, 2010 at the following address:**

> Heller Ehrman LLP Plan Balloting
> c/o Development Specialists, Inc.
> 235 Pine Street, Suite 1150
> San Francisco, CA 94104
> (ph) 415.981.2717

**Do not send your ballot via facsimile or e-mail.**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

If your ballot is not properly completed, signed and returned as described, it will not be counted. If your ballot is damaged or lost, you may request a replacement by sending a written request to the above address.

### 2. Who May Vote

The Plan divides the Claims of Creditors into nine (9) Classes. There is one (1) Class of Interests. The Classes are as follows: Class 1 (Priority Employee Claims), Class 2 (Biggers Priority Employee Claims), Class 3 (Priority Employee Benefit Claims), Class 4 (Secured Claims of Bank of America and Citibank), Class 5 (Secured Claim on MPC Insurance, Ltd), Class 6 (Insured Malpractice Claims), Class 7 (General Unsecured Claims), Class 8 (Biggers Subordinated Unsecured Claims), Class 9 (Subordinated Former Shareholder Claims) and Class 10 (Interests).

Classes of Creditors that are impaired by the Plan are entitled to vote, unless no compensation or payment is provided for such Class, in which event such Class is conclusively deemed to have rejected the Plan. Each holder of an Allowed Claim in an impaired Class that will receive distributions under the Plan on account of such claims may vote to accept or reject the Plan. A Class is impaired if the legal, equitable or contractual rights attaching to the claims or interests of the Class are modified, other than by curing defaults and reinstating maturities.

**Classes 4, 6, 7, 8, 9 and 10 are impaired under the Plan and are entitled to vote thereon.**

In determining acceptances of the Plan, the vote of a Creditor will only be counted if submitted by a Creditor whose Claim is an Allowed Claim. Generally speaking, a Creditor holds an Allowed Claim if such Claim is duly scheduled by the Debtor as other than disputed, contingent or unliquidated, or the Creditor has timely filed with the Bankruptcy Court a proof of Claim which has not been objected to or disallowed prior to computation of the votes on the Plan. The Ballot form which you received does <u>not</u> constitute a proof of Claim.

### D. Confirmation

"Confirmation" is the technical phrase for the Bankruptcy Court's approval of a plan of reorganization. At the Confirmation Hearing, in order to confirm the Plan, the Debtor must demonstrate that it has met the requirements of section 1129 of the Bankruptcy Code. If the Bankruptcy Court determines that all of the requirements of section 1129 have been satisfied, the

000009

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    Bankruptcy Court will enter an order confirming the Plan.  The Debtor believes that the Plan

2    satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code for Confirmation of the

3    Plan.

4    Voting is tabulated by class.  As discussed above, a class of creditors or interest holders has

5    accepted a plan of reorganization if the plan has been accepted by two-thirds (2/3) in dollar amount

6    and more than one-half (1/2) in number of creditors or interest holders holding allowed claims or

7    interests in that class who actually vote to accept or reject such plan.

8    Even if a class of creditors or interests votes against a plan of reorganization, the plan may

9    nevertheless be confirmed by the Bankruptcy Court, notwithstanding the rejection of the Plan by

10   such class, so long as certain statutory requirements are met by the Plan.  This procedure is called a

11   "cram down."  The Debtor will request that the Bankruptcy Court confirm the Plan in accordance

12   with section 1129(b) of the Bankruptcy Code if any Class rejects the Plan.

13   The Bankruptcy Court has set July 6, 2010 at 1:30 p.m., as the hearing date to determine

14   whether the Plan has been accepted by the requisite number of Creditors and whether the other

15   requirements for Confirmation of the Plan have been satisfied. The hearing on confirmation will be

16   held at the United States Bankruptcy Court, 235 Pine Street, 22nd Floor, San Francisco, California,

17   94104.  This hearing may be continued from time to time and day to day without further notice.  If

18   the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order.  Any objections to

19   Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy

20   Court and served on the parties set forth below on or before the date set forth in the Notice of

21   Confirmation Hearing sent to you with this Disclosure Statement and the Plan.

22   Objections must be served upon:

23   (1) The Debtor:

24   Heller Ehrman LLP
     333 Bush Street, 10th Floor
25   San Francisco, CA  94104
     Attn: Shelley Salinero
26   Telephone:  (415) 772-6463
     Facsimile:   (415) 772-6268

27

28

000010

1   (2) Counsel for the Debtor:

2   John D. Fiero, Esq.
    Teddy M. Kapur, Esq.
3   Pachulski Stang Ziehl & Jones LLP
    150 California Street, 15th Floor
4   San Francisco, CA 94111
    Telephone: (415) 263-7000
5   Facsimile: (415) 263-7010

6   (3) Counsel for the Committee:

7   Thomas A. Willoughby, Esq.
    Felderstein, Fitzgerald, Willoughby & Pascuzzi, LLP
8   400 Capital Mall, Suite 1450
    Sacramento, CA 95814
9   Telephone: (916) 329-7400
    Facsimile: (916) 329-7435

10  and

11  (4) The Office of the United States Trustee

12  Minnie Loo
13  Office of the United States Trustee
    235 Pine Street, 7th Floor
14  San Francisco, CA 94104
    Telephone: (415) 705-3333
15  Facsimile: (415) 705-3379

16  **E.    Disclaimers**

17  THIS DISCLOSURE STATEMENT CONTAINS INFORMATION WHICH MAY BEAR

18  UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN.

19  PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THIS DISCLOSURE

20  STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN

21  SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE

22  NATURE AND HISTORY OF THE DEBTOR AND THE CONDITION OF THE DEBTOR'S

23  BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE

24  INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT

25  CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.  *SEE* 11 U.S.C.

26  § 1125(a).

27  FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT

28  SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

000011

SUMMARY. *IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING*.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

## II.

## PLAN OVERVIEW

### A.    Introduction

The Plan provides for the liquidation of the Debtor's remaining Assets, the winding up of its affairs and the payment of liabilities through distributions under the Plan. Post-confirmation, the Debtor will be managed by a Plan Administrator, subject to the oversight and approval of the Committee, which may have as few as one member as time passes, who will complete the process of liquidating the Debtor's Assets, including overseeing the prosecution of certain causes of action against third parties, the recoveries of which may inure to the benefit of Creditors. The Plan Administrator will also be in charge of making distributions to Creditors.

Payments under the Plan (as well as the operating costs of the Liquidating Debtor) will be funded through a combination of: (1) the proceeds of causes of actions against third parties (referred to in the Plan as the Avoidance Actions and Retained Claims and Defenses); (2) the Debtor's cash on hand at Confirmation, and (3) a $3,000,000.00 Exit Financing facility provided by the six partners that hold an equity interest in the Debtor (Heller Ehrman (California), Heller Ehrman White & McAuliffe (Washington), P.S, Heller Ehrman White & McAuliffe (Oregon), P.C., Heller Ehrman (Alaska), P.C., Heller Ehrman (New York), and Heller Ehrman (China), P.C. (collectively, the "Heller Ehrman PCs")).

The Plan requires payments totaling $11,457,000.00 be made to the holders of certain Professional Fee Claims, Administrative Claims and Priority Claims on the Effective Date (the "Effective Date Payments"). As is set forth in the Debtor's projected Sources & Uses of Cash at Confirmation (attached hereto as **Exhibit C),** the Debtor estimates it will have $13,075,000.00 with

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

000012

… 

which to make the required payments. Post-Effective Date distributions to Creditors under the Plan will depend to a great extent on the successful prosecution and/or settlement of claims and actions against third parties; therefore, it is impossible to predict, at this moment, the exact timing or amount of distributions to Class 7 General Unsecured Creditors. The Debtor's best estimate, however, as to the timing and amount of potential recoveries in the Avoidance Actions and in the Retained Claims and Defenses, the costs attended thereto and the payment of Plan distributions is set forth in its Post-Confirmation Cash Budget attached hereto as **Exhibit B.** Assuming the projected recoveries are realized, at present, the Debtor estimates making an initial distribution to Class 7 General Unsecured Creditors in 2011.

As distributions to Class 7 General Unsecured Creditors are made on a pro rata basis within each Class, the amount of distributions to Unsecured Creditors will also depend on the total dollar amount of Allowed Claims in each Class. The Debtor has not completed its analysis of every Claim. Nor has it completed the process of objecting to Claims. The Debtor's best estimate, however, at this time, is that if all potential objections to Claims were resolved in its favor, the total amount of Allowed Class 7 General Unsecured Claims would be approximately $80,000,000. The amount of Class 7 Claims in excess of $80,000,000.00 that remain in dispute is $120,000,000. The Debtor believes that it will prevail on objections or through settlements and only estimates that it will eventually allow 12.5% of the disputed amounts. for a total projected Class 7 Claims of $95,000,000.

The amount of Allowed Claims in Class 7 (General Unsecured Claims) could significantly increase if the Debtor prevails in the Bank of America Preference Action (described herein in Section IV) and Bank of America is able to assert a claim under Bankruptcy Code section 502(h). Assuming the Debtor recovered $60,000,000.00 in the Bank of America Preference Action and Bank of America's 502(h) Claim was, accordingly, $60,000,000.00, Class 7 General Unsecured Claims could be as high as $155,000,000.00.

**B.    Treatment of Claims**

The following chart summarizes the treatment of Creditors and Interest Holders under the Plan. Amounts listed below are estimated.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| TREATMENT OF CLAIMS CHART | | | | |
|---|---|---|---|---|
| Chart § | Class No. | Description | Estimate of Claims and Recoveries | Plan Treatment |
| A | N/A | Allowed Administrative Claims | Estimated amount of Claims in this category: $300,000.00<br><br>Estimated Recovery on Allowed Claims in this category: 100% | Each Allowed Administrative Claim, unless the holder of such Claim has agreed to a different treatment, shall be paid in full by the Liquidating Debtor from Available Cash or the Reserved Claims Pool Account (as applicable) on the latest of: (a) the Effective Date, or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (c) the tenth Business Day after such Claim is Allowed, or as soon thereafter as practicable; and (d) such date as the holder of such Claim and the Liquidating Debtor may agree. |
| B | N/A | Allowed Claims for Professional Fees | Estimated amount of Claims in this category: $2,075,000.00<br><br>Estimated Recovery on Allowed Claims in this category: 100% | Each party seeking an award by the Bankruptcy Court of Professional Fees: (a) must file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date on or before the Administrative Claims Bar Date; and (b) if the Bankruptcy Court grants such an award, each such party will be paid in full in Cash by the Liquidating Debtor in such amounts as are allowed by the Bankruptcy Court as soon thereafter as practicable. All final applications for allowance and disbursement of Professional Fees must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order and the Bankruptcy Court's Guidelines for Compensation and Expense Reimbursement of Professionals and Trustees. |
| C | N/A | Allowed Priority Tax Claims | Estimated amount of Claims in this category: $4,040,000.00<br><br>Estimated Recovery on Allowed Claims in this category: 100% | Each Allowed Priority Tax Claim, unless the holder of such Claim has agreed to a different treatment, shall receive deferred cash payments to the extent permitted by section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the rate established by applicable nonbankruptcy law as of the calendar month in which the Plan is confirmed, or at such other rate as may be agreed upon between the Liquidating Debtor and the appropriate governmental unit, provided that the Liquidating Debtor may prepay any or all such Claims at any time, without premium or penalty. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | | | TREATMENT OF CLAIMS CHART | |
|---|---|---|---|---|
| Chart § | Class No. | Description | Estimate of Claims and Recoveries | Plan Treatment |
| D | 1 | Allowed Priority Employee Claims | Estimated amount of Claims in this Class: $3,382,000.00<br><br>Estimated Recovery on Allowed Claims in this Class: 100%<br><br>**UNIMPAIRED**<br><br>**NOT ENTITLED TO VOTE** | Each holder of an Allowed Priority Employee Claim who is not employed by the Debtor as of the Effective Date of the Plan shall receive full payment of the Allowed amount of such Claim from Net Available Cash on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim. The Liquidating Debtor shall either pay or honor in the ordinary course of business, any Allowed Class 1 Priority Employee Claim for any employee who is employed by the Liquidating Debtor on the Effective Date of the Plan. Holders of Class 1 Claims who are members of the Biggers Class shall receive their distribution hereunder even if they Opt-Out of the Biggers Settlement. |
| E | 2 | Allowed Biggers Priority Employee Claims | Estimated amount of Claims in this Class: $1,500,000.00<br><br>Estimated Recovery on Allowed Claims in this Class: 100%<br><br>**UNIMPAIRED**<br><br>**NOT ENTITLED TO VOTE** | Each holder of an Allowed Biggers Priority Employee Claim who is not employed by the Debtor as of the Effective Date of the Plan shall receive full payment of the Allowed amount of such Claim from Net Available Cash only after the Biggers Approval Order becomes a Final Order. Holders of Class 2 Claims who opt-out of the Biggers Settlement will not receive any payment on account of such claim. |
| F | 3 | Allowed Priority Employee Benefit Claims | Estimated amount of Claims in this Class: $700,000.00<br><br>**UNIMPAIRED**<br><br>**NOT ENTITLED TO VOTE** | Class 3 shall consist of Priority Employee Benefits Claims. Class 3 Claims are unimpaired. After payment in full of the Allowed Claims of Classes 1 and 2, each holder of an Allowed Priority Employee Benefit Claim shall receive full payment of the Allowed amount of such Claim from Net Available Cash on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim. |
| G | 4 | Secured Claims of Bank of America and Citibank | Estimated amount of Claims in this Class: $1,609,752.26 (principal and interest as of 6/30/10)<br><br>$0.00-$4,000,000.00 attorneys fees<br><br>Estimated Recovery on Allowed Claims in this Class: 100% of principal, interest and attorneys' fees, | Class 4 consists of the Disputed Secured Claims of Bank of America and Citibank. Class 4 Claims are impaired. On the Effective Date, and subject to the right of the Estate to recover the funds in the Bank of America Preference Action or in such other action as may subsequently be filed by the Estate, Bank of America and Citibank shall effect a payment of $1,609,752.26 (assuming a payment date of June 30, 2010, increasing or decreasing by $253.30 daily), which represents the undisputed amounts of principal and interest (but not attorneys' fees and costs) owing on the Class 4 |

SF:6787020.1   DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF LIQUIDATION

10

000015

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |

# TREATMENT OF CLAIMS CHART

| Chart § | Class No. | Description | Estimate of Claims and Recoveries | Plan Treatment |
|---|---|---|---|---|
| | | | if any<br><br>**IMPAIRED**<br><br>**NOT ENTITLED TO VOTE DUE TO PENDING OBJECTION** | Claim by applying funds from the Cash Collateral Account thereto. Bank of America and Citibank shall then return to the Liquidating Debtor the balance of the funds in the Cash Collateral Account, which as of June 30, 2010 are estimated to be $93,936.73. Funds returned to the Liquidating Debtor from the Cash Collateral Account shall not be segregated nor otherwise accounted for to Class 4 Creditors. Also on the Effective Date, the Liquidating Debtor shall grant Bank of America and Citibank a first-priority security interest in any and all proceeds the Liquidating Debtor receives from the Retained Claims and Defenses, provided, however, that the Liquidating Debtor shall first use any such proceeds to pay its attorneys' fees and costs incurred in connection with the Retained Claims and Defenses. Any such proceeds so used shall not be subject to any security interest of Bank of America or Citibank. Such security interest shall secure payment of Bank of America and Citibank's attorneys' fees and costs incurred in connection with the Bank of America Preference Action, in an amount (the "Secured Amount") equal to the lesser of $4 million or the total attorneys' fees and costs Bank of America and Citibank estimate (in good faith on the Effective Date) they will incur in connection therewith. From proceeds of the Retained Claims and Defenses, and prior to making a distribution to Creditors in Classes 7, 8 and 9 pursuant to the Plan, the Liquidating Debtor shall segregate the Secured Amount until, and shall not disburse any portion thereof before, the release of the security interest therein. Notwithstanding the preceding sentence, the Liquidating Debtor may pay Plan Expenses from Available Cash (including Available Cash consisting of proceeds of the Retained Claims and Defenses). Such security interest shall continue in full force and effect unless and until a court of competent jurisdiction enters a final judgment in the Bank of America Preference Action which does not require the Liquidating Debtor to pay Bank of America and Citibank's attorneys' fees and costs incurred in connection therewith. Notwithstanding the preceding sentence, such security interest shall continue in full force and effect after entry of such final judgment if Bank of America and Citibank post, and for so long as Bank of America and Citibank maintain, a bond for the benefit of the Liquidating Debtor (in a form acceptable to the Liquidating Debtor in its reasonable discretion) in an amount equal to the |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

000016

| Chart § | Class No. | Description | Estimate of Claims and Recoveries | Plan Treatment |
|---|---|---|---|---|
| | | | | Secured Amount. Such bond shall be in addition to any other bond or security Bank of America and/or Citibank may be required to post under applicable law, including but not limited to any bond required as a condition to the appeal of a final judgment entered in the Bank of America Preference Action.  In the event Bank of America and Citibank prevail in the Bank of America Preference Action and no stay is entered or bond posted, Bank of America and Citibank shall be entitled to file a motion in that lawsuit seeking payment of the attorneys fees they believe are due and payable in an amount not to exceed the Secured Amount.  The Liquidating Debtor, Bank of America and Citibank shall make such customary arrangements and execute such customary documents, as mutually agreed upon, to effectuate a release of Bank of America and Citibank's security interests or liens in the Liquidating Debtor's assets upon receipt of the payments required hereunder; and shall also make such customary arrangements and execute such customary documents, as mutually agreed upon, to effectuate a release of the security interest described in the preceding paragraphs upon the termination of such security interest in accordance with the Plan. The Bankruptcy Court shall retain jurisdiction to resolve any disputes which may arise in connection with the foregoing matters.  Notwithstanding the foregoing, nothing in the Plan shall affect or diminish the Retained Claims and Defenses against Bank of America or Citibank, nor shall anything in the Plan affect or diminish the Debtor's rights in the Bank of America Preference Action. |
| H | 5 | Secured Claim of MPC | Estimated amount of Claims in this Class: $57,881.94  Estimated Recovery on Allowed Claims in this Class: 100%  **UNIMPAIRED**  **NOT ENTITLED TO VOTE** | Class 5 shall consist of the secured claim of MPC. MPC filed proof of claim number 604 in the amount of $57,881.94 plus contingent amounts, which is allegedly secured by a right of offset and perfected by a filed UCC-1. Class 5 is a Disputed Claim. To the extent that the Claim of MPC is an Allowed Secured Claim, MPC shall be entitled to its legal and contractual rights as a secured claimant. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

TREATMENT OF CLAIMS CHART

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| TREATMENT OF CLAIMS CHART | | | | |
|---|---|---|---|---|
| Chart § | Class No. | Description | Estimate of Claims and Recoveries | Plan Treatment |
| I | 6 | Insured Malpractice Claims | Estimated Recovery on Allowed Claims in this Class: 100% from insurance<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | Class 6 shall consist of Insured Malpractice Claims. Such claims are impaired and shall be paid solely from the available insurance proceeds of any applicable Malpractice Policy. No holder of an Allowed Class 6 Claim shall receive any distribution from Available Cash on account of such Class 6 Claim. If any portion of the Allowed amount of a Malpractice Claim is greater than the SIR, the Claim will be bifurcated and treated in two different classes as follows: (a) the amount of the Allowed Claim that is greater than the SIR will be a Class 6 Insured Malpractice Claim; and (b) the amount of the Allowed Claim that is less than or equal to the SIR Amount will be a Class 7 General Unsecured Claim. For example, assume the SIR equals $2,000,000.00 and there are $500,000.00 of Malpractice Claim Expenses related to a Malpractice Claim that is ultimately allowed in the amount of $6,000,000.00. The SIR Amount is $1,500,000.00 (i.e., the SIR - the Malpractice Claim Expenses). The Allowed amount of the Claim that is greater than the SIR (i.e., $6,000,000.00-$ 2,000,000.00 =$4,000,000.00) is a Class 6 Insured Malpractice Claim. The amount of the claim that is equal to or less than the SIR Amount (i.e., $1,500,000.00) will be a Class 7 General Unsecured Claim. Any Malpractice Claim that is Allowed in an amount that is less than the SIR shall not fall within Class 6, but shall be instead a Class 7 General Unsecured Claim. For example, assume the SIR equals $2,000,000.00 and there are $500,000.00 of Malpractice Claim Expenses related to a Malpractice Claim that is ultimately allowed in the amount of $1,400,000.00. In this instance the SIR Amount is $1,500,000.00. Since the Allowed amount of the Claim is less than the SIR, the Claimant will have a Class 7 General Unsecured Claim for $1,400,000.00. In no event shall a Malpractice Claim treated as a Class 7 General Unsecured claim be allowed in an amount in excess of the SIR. Any Malpractice Claim that is Allowed in an amount that is less than the SIR shall not fall within Class 6, but shall be instead a Class 7 General Unsecured Claim. |
| J | 7 | Unsecured Claims | Estimated amount of Claims in this Class: **$95 million to $155 million.**<br><br>Estimated Recovery on Allowed Claims in this Class: 22%-68% | Class 7 shall consist of Unsecured Claims, including but not limited to Biggers Unsecured Claims and Uninsured Malpractice Claims. Class 7 does not include Biggers Subordinated Unsecured Claims (Class 8) or the Subordinated Former Shareholder Claims (Class 9). Class 7 Claims are impaired. Any Malpractice Claim that is Allowed in an amount that is less than the |

36835-001\DOCS_SF:67870.20

13    DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF LIQUIDATION

000018

| | | | TREATMENT OF CLAIMS CHART | |
|---|---|---|---|---|
| Chart § | Class No. | Description | Estimate of Claims and Recoveries | Plan Treatment |
| | | | The estimated dividend is based on projected litigation recoveries. The actual dividend could be less than 22%, or if the litigations are extremely successful, could be higher than 68% <br><br> **IMPAIRED** <br><br> **ENTITLED TO VOTE** | SIR shall not fall within Class 6, but shall be instead a Class 7 General Unsecured Claim. For example assume the SIR equals $2,000,000.00 and there are $500,000.00 of Malpractice Claim Expenses related to a Malpractice Claim that is ultimately allowed in the amount of $1,400,000.00. In this instance the SIR Amount is $1,500,000.00. Since the Allowed amount of the Claim is less than the SIR, the Claimant will have a Class 7 General Unsecured Claim for $1,400,000.00. In no event shall a Malpractice Claim treated as a Class 7 General Unsecured Claim be allowed in an amount in excess of the SIR. Each holder of an Allowed Class 7 Claim shall receive a Pro Rata Share of Net Available Cash after deductions for the payment (or appropriate reserve for) the Allowed Claims of senior classes of Claims and reserves for Disputed Claims, Professional Fees and/or Plan Expenses. Notwithstanding the preceding sentence, in the event Bank of America and Citibank become holders of Allowed Unsecured Claims by virtue of Bankruptcy Code section 502(h), the Liquidating Debtor shall not make any further disbursements to any other holder of an Allowed Unsecured Claim until Bank of America and Citibank receive the Cash they would have received in the Chapter 11 Case had they held Allowed Unsecured Claims on the Effective Date. For example, if Class 7 creditors have received distributions totaling 20% of their Allowed Claims at the time that the Banks' Allowed Unsecured Claim arises, the Banks will be paid 20% of their Allowed Unsecured Claims before any futher distributions to the other members of Class 7. To the extent that all Allowed Class 7 Claims have been paid in full, including post-petition interest at the annual rate of five per cent (5%) simple interest per annum, any remaining funds in the Claims Reserve Account shall be used by the Liquidating Debtor to fund the expense of claims in Class 8, as described below. Holders of Class 7 Claims who are also members of the Biggers Class shall receive their distribution hereunder for the portion of such Claim that is not a Biggers Unsecured Claim even if they Opt-Out of the Biggers Settlement. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | | | | TREATMENT OF CLAIMS CHART |
|---|---|---|---|---|
| | Chart § | Class No. | Description | Estimate of Claims and Recoveries | Plan Treatment |
| K | 8 | Subordinated Biggers Unsecured Claims | Estimated amount of Claims in this Class: $7,000,000.00<br><br>Estimated Recovery on Allowed Claims in this Class: 0%<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | Once Allowed Class 7 Claims are satisfied in full with interest as described above, each holder of an Allowed Class 8 Claim shall receive a Pro Rata Share of Net Available Cash after deductions for the payment (or appropriate reserve for) the Allowed Claims of senior classes and reserves for Disputed Claims, Professional Fees and/or Plan Expenses. To the extent that all Allowed Class 8 Biggers Subordinated Unsecured Claims have been paid in full, including post-petition interest at the annual rate of five per cent (5%) simple interest per annum, and funds remain in the Claims Reserve Account, such funds shall be used by the Liquidating Debtor to fund the expense of claims in Class 9, as described below. |
| L | 9 | Subordinated Former Shareholder Claims | Estimated amount of Claims in this Class: $4,849,000.00<br><br>Estimated Recovery on Allowed Claims in this Class: 0%<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | Class 9 shall consist of all Subordinated Former Shareholder Claims. Class 9 Claims are impaired. The Claims in this class are subordinated pursuant to the express subordination provision contained in the Subordinated Former Shareholders Notes, which provides, "Payment of principal of and interest on this note is subordinate to the prior payment of indebtedness of the [Debtor] for borrowed money; provided however that the payments hereunder shall be payable when due if at such time the [Debtor] is not in default with respect to any such indebtedness." The Claims in this class are also subordinated pursuant to the express subordination provision in the Debtor's Plan of Dissolution, which provides, "There will be no return of capital to any Shareholder, recently departed Shareholder, or former or retired Shareholder and no payment of any kind made to former and/or retired Shareholders until such time as all of the legal obligations of the [Debtor] to third party creditors have been satisfied, except if permitted by the [Debtor's] senior secured lenders, Shareholders may pursue claims for compensation for services rendered prior to their departure or other expenses of contractual rights arising from or related to their employment." Plan of Dissolution at XI(E). Once Allowed Class 7 and 8 Claims are satisfied in full with interest, as described above, each holder of an Allowed Subordinated Former Shareholder Claim shall receive a Pro Rata Share of Net Available Cash after deductions for the payment (or appropriate reserve for) the Allowed Claims of senior classes and reserves for Disputed Claims, Professional Fees and/or Plan Expenses. To the |

Case: 08-32514   Doc# 1153   Filed: 05/25/10   Entered: 05/25/10 14:07:51   Page 20 of 80
SF68 85-001\DOCS_SF:67472.20        15        DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF LIQUIDATION

000020

| Chart § | Class No. | Description | Estimate of Claims and Recoveries | Plan Treatment |
|---------|-----------|-------------|-----------------------------------|----------------|
| | | | | extent that all Allowed Class 9 Subordinated Shareholder Claims have been paid in full, including post-petition interest at the annual rate of five per cent (5%) simple interest per annum, and funds remain in the Claims Reserve Account, such funds shall be distributed to the Holders of Class 10 Interests, as described below. |
| M | 10 | Interests | 0%  **IMPAIRED**  **ENTITLED TO VOTE** | On the Effective Date, the Interest Holders shall have no ability to direct or control the affairs of the Liquidating Debtor, but shall retain their status as partners of the Liquidating Debtor. Interest Holders shall receive nothing under the Plan until the Allowed Claims of Classes 1 through 9 are paid in full, with interest at the rate of five per cent (5%) simple interest per annum, at which point all Net Available Cash, net of amounts reserved for Disputed Claims, Professional Fees and/or Plan Expenses, shall be paid to the Interests Holders consistent with the extent of their Interests. |

## III.

## OVERVIEW OF CHAPTER 11 CASE

This section of the Disclosure Statement discusses the significant events in the Chapter 11 Case to date, including events leading up to the commencement of this case. Copies of all relevant court papers are on file with the Bankruptcy Court.

### A.   Events Leading Up to the Filing of the Chapter 11 Case

#### 1.   Description of the Debtor

Heller Ehrman LLP, a California limited liability partnership (the "Debtor"), adopted a Plan of Dissolution as of September 26, 2008 (the "Plan of Dissolution"). The Plan of Dissolution was adopted by the affirmative vote of more than two-thirds (2/3) of the shareholders of the Heller Ehrman PCs who were eligible to vote. Pursuant to the Plan of Dissolution, the Dissolution Committee (as provided in the Plan of Dissolution) is authorized to, among other things, wind up the Debtor's business and affairs and to cause the ultimate dissolution of the Debtor, including through the filing of a voluntary petition under the Bankruptcy Code.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

000021

The Debtor's predecessor law firm was founded in San Francisco, California roughly 120 years ago, in 1890. Over the following years, the Debtor expanded by adding attorneys to the firm and by adding additional office locations. Ultimately, the Debtor offered the services of more than 730 attorneys in offices all across the United States and in Europe and Asia, including offices in New York City, Los Angeles, Washington, D.C., London, Hong Kong, Beijing and Singapore.

The Debtor adopted its current form of organization – a limited liability partnership, the partners of which are professional corporations – in 2000. The Debtor is a California Limited Liability Partnership whose six partners (i.e., the Heller Ehrman PCs) are professional corporations organized under the laws of the principal states where the Debtor operated. The Debtor was the entity which provided legal services, billed for those services, and employed the associates, special counsel and staff who provided those services. In general, the firm's "shareholders" were each employed by one of the Heller Ehrman PCs pursuant to written employment agreements.

After experiencing financial difficulties and following unsuccessful merger attempts with several other law firms, and as a result of its lenders declaring a default under the Debtor's line of credit triggered by shareholder departures that caused a breach of lending covenants, the Debtor decided it was in the best interests of its creditors, equity interest holders and other parties in interest for the Debtor to wind down the business of the firm, leading to the adoption of the Plan of Dissolution. Following adoption of the Plan of Dissolution, the Debtor immediately began to wind down operations. Among other things, the Debtor focused on billing and collecting accounts receivable, and began selling or otherwise disposing of the Debtor's other assets, paying or otherwise discharging claims against the Debtor, vacating leased premises, and transitioning and securing client files and business records. Through this process, the Debtor paid off substantially all of its secured debt, negotiated settlements with landlords, and made other substantial progress in winding down the Debtor's business and affairs.

### 2. The Debtor's Pre-Petition Credit Facility

Bank of America, N.A. ("Bank of America" or "Agent"), as agent for itself and Citibank, N.A. ("Citibank") is the Debtor's only prepetition secured creditor. Bank of America, N.A. is the Administrative Agent, Swing Line Lender and L/C Issuer under that certain prepetition Credit

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Agreement (the "Prepetition Credit Agreement") by and among the Debtor, certain other lenders and Bank of America Securities LLC as Sole Lead Arranger and Sole Book Manager (collectively, the "Lenders"). These same parties also entered into and executed various other agreements and documents, which together with the Prepetition Credit Agreement, are referred to herein as the "Prepetition Loan Documents."

Through the Prepetition Credit Agreement, the Debtor obtained a revolving line of credit up to the amount of $50 million (the "Line of Credit") and letter of credit commitments of $20 million (the "L/C Commitment"). On July 30, 2008, the parties executed an amendment to the Prepetition Credit Amendment that, among other things, provided for a term loan of $10 million (the "Term Loan"). The obligations to the Agent and the Lenders under the Prepetition Loan Documents are purportedly secured by a security interest in and lien upon all or substantially all of the Debtor's personal property.

The Agent attempted to perfect its security interest by filing a UCC Financing Statement with the California Secretary of State on January 3, 1991 (the "Original Financing Statement"), which was amended and continued by subsequent UCC filings. However, the Agent filed a termination statement related to Original Financing Statement pursuant to a UCC Financing Statement Amendment filed on August 3, 2007 (the "Termination Statement"). Over a year later, apparently recognizing that its security interest had or may have become unperfected, the Agent filed a UCC Correction Statement on October 1, 2008 (the "Correction Statement"), which stated that the Termination Statement "was filed in error and as a result of a clerical error" and purported to continue the Original Financing Statement. The Agent then filed a new UCC Financing Statement covering the Debtor's assets on October 2, 2008 (the "New Financing Statement"), which purported to "reaffirm" the Original Financing Statement and set forth the collateral covered by its security interest. The Debtor filed this chapter 11 case on or before December 31, 2008 in part to ensure the filing of the New Financing Statement fell within the 90-day preference period under Section 547 of the Bankruptcy Code. During the 90-day period preceding the Petition Date, the Agent received approximately $51 million in payments from the Debtor on account of the Debtor's principal obligations under the Prepetition Loan Documents.

SF683481v1\DOCS_SF:67479.20   DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION
18
000023

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

### 3.    Events Precipitating the Debtor's Filing

It is important to note that the Debtor's decision to file this case was not prompted by the Debtor running out of money.  The Debtor had great success in collecting outstanding receivables pre-petition and believed that it would continue to do so.  Notwithstanding this success, the Debtor decided that a Chapter 11 filing was in the best interests of the Debtor, its creditors and other parties in interest, for the reasons discussed next.

The Committee contends that the Agent filed a statement terminating the Banks' UCC-1 financing statement on our about August 3, 2007.  The Agent claims that the filing of the Termination Statement was a result of clerical error and that Banks should be treated as secured creditors.  An attempt was made to remedy any problems caused by the filing of the Termination Statement on October 1, 2008, when the Agent filed a so-called Correction Statement which the Agent purports would continue in effect the Original Financing Statement dated January 3, 1991.  Further, on October 2, 2008, a new "original" financing statement was recorded by the Agent, with descriptive language in effect claiming that such document reaffirmed the 1991 filing and that the 1991 filing continued in effect.

The Banks also contend that they have a defense based on the structure and operation of the Debtor and the Heller Ehrman PCs.  The Heller Ehrman PCs, plus other parties related to the Debtor, executed a guaranty of the Banks' loans to the Debtor and granted a security interest in certain personal property.  As a result, among other defenses, the Banks argue that the October 1 and 2 filings did not improve the Banks' collateral position because the Heller Ehrman PCs had sufficient rights in the receivables and other collateral (proceeds of which were the source of the payments made to the Banks during the preference period) to grant the Banks a security interest in that collateral and that the security interests granted by the Heller Ehrman PCs were at all times perfected by financing statements naming the Heller Ehrman PCs as debtors.  There are other defenses that the Banks raise, which are reflected in the answer to the Bank of America Preference Action.

If the Agent's liens are avoidable, then it would not be entitled to receive distributions on its claims any greater than the pro rata amount distributed to the Debtor's general unsecured creditors.  The Debtor attempted to reach a settlement with the Agent that would fund treatment of the Debtor's

000024

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    unsecured creditors comparable to the treatment they would likely receive in a bankruptcy case, and

2    potentially avoid the need to file this case, but was unable to reach a satisfactory agreement that the

3    Committee asserts would have been in the best interests of the Debtor and its creditors.

4        A second circumstance contributing to the decision to file this case relates to the Debtor's

5    San Francisco landlord, 333 Bush Associates.  The Dissolution Committee and the Debtor's

6    professionals have devoted extensive efforts in attempting to negotiate a settlement with its San

7    Francisco landlord.  The San Francisco landlord filed suit against the Debtor in San Francisco

8    Superior Court and, over the Debtor's objection, was able to obtain a Writ of Attachment from the

9    Court on December 19, 2008.  Although the Debtor was nevertheless able to negotiate settlement

10   terms with the San Francisco landlord that would, in the view of the Dissolution Committee, have

11   permitted equitable treatment of other creditors, a requirement of this settlement was an immediate

12   cash payment to the San Francisco landlord.  As a result of the levy of the landlord's writ of

13   attachment and internal bank procedures that (according to the Agent) were triggered by that levy,

14   the Debtor was unable to make this payment before it became apparent that this Chapter 11 case

15   would have to be filed in any event due to the position of the Agent in the Debtor's settlement

16   negotiations as described above.  Hence, an added consequence of this Chapter 11 case was to cancel

17   the lien of the San Francisco landlord's attachment.

18       The Debtor had hoped that it would be able to wind down the Debtor's business and treat all

19   creditor claims outside of the jurisdiction of the Bankruptcy Court.  Among other things, an out-of-

20   court dissolution (assuming resolution of the issues with the Agent and the San Francisco landlord)

21   may have ultimately led to larger distributions to creditors because the Debtor would have been able

22   to avoid administrative and other bankruptcy-related expenses.  Until literally hours before its filing

23   for chapter 11 bankruptcy protection, the Debtor continued to negotiate for an acceptable resolution

24   with the Agent on a basis that would have been fair and reasonable to all of the Debtor's creditors.

25   Despite extensive efforts, the Dissolution Committee was unable to reach an agreement that, in its

26   business judgment, would have been fair and equitable to all of the Debtor's creditors.

27       Based on these facts and circumstances, the Debtor believed that filing this case would,

28   among other things, ensure the Debtor will have access to the cash it needed to effectively and

Case: 08-32514    Doc# 1153    Filed: 05/25/10    Entered: 05/25/10 14:07:51    Page 25
of 80

20

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

DOCS_SF:67472.20

000025

efficiently wind down operations and administer the estate, and also preserve whatever rights and claims the Debtor may have with respect to the perfection of the Agent's security interests and the rights and claims of the San Francisco landlord.

### B. Summary of Events During the Chapter 11 Case

The following is a summary of important events that have taken place since the Petition Date.

#### 1. "First Day" Pleadings

Contemporaneously with the filing of the Debtor's chapter 11 petition, the Debtor filed certain standard "first day" pleadings (the "First Day Pleadings") requesting relief from the Bankruptcy Court that would minimize the disruption caused by the bankruptcy filing to its ordinary business operations, including the following:

• *Motion of Debtor and Debtor in Possession for Order (1) Authorizing Debtor and Debtor in Possession to (A) Pay and Honor Pre-Petition Employee Wages and Other Employee Obligations in the Ordinary Course of Business, and (B) Continue Honoring Employee Obligations, Including Wages, Benefits and Retention Bonuses, on a Post-Petition Basis; and (2) Providing Related Relief* [Docket No. 5]

• *Motion of the Debtor for Order (A) Authorizing Maintenance of Existing Bank Accounts and Continued Use of Existing Business Forms and Checks, and (B) Authorizing Continued Use of Existing Cash Management System* [Docket No. 7]

• *Debtor's Application for Order Appointing Peter J. Benvenutti Responsible Individual* [Docket No. 8]

• *Motion of Debtor and Debtor in Possession for Order: (1) Granting Debtor and Debtor in Possession Interim Use of Cash Collateral; (2) Scheduling Deadlines Relating to a Final Hearing on Permanent Use of Cash Collateral; and (3) After Conclusion of a Final Hearing, Authorizing Permanent Use of Cash Collateral* [Docket No. 9]

The Bankruptcy Court held an expedited hearing on the First Day Pleadings on December 29, 2008. Following the December 29, 2008 hearing on the First Day Pleadings, the Bankruptcy Court entered several orders related to the First Day Pleadings on December 30, 2008, which orders, as well as certain subsequent orders, are discussed in the following paragraphs.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## 2. Filing of Schedules, Meeting of Creditors and Bar Date

On January 26, 2009, the Debtor filed its Schedules and Statement of Financial Affairs with the Bankruptcy Court. The Schedules provide detailed information on the Debtor's assets and liabilities, as well as other information about its business. The Schedules were amended on December 15, 2009 (the "Amended Schedules"), and amendments to the Statement of Financial Affairs were filed on October 23, 2009. In addition, on January 27, 2009, the United States Trustee conducted the Section 341 meeting of creditors in the Debtor's chapter 11 case. Pursuant to rules 2002(1) and 9008 of the Federal Rules of Bankruptcy Procedure, the deadline for filing proofs of Claim in the Bankruptcy Case for non-Governmental Units was April 27, 2009. The Debtor also sought and obtained a subsequent deadline of March 19, 2010 for the filing of proofs of claims for creditors who were listed on its Amended Schedules. The Court set March 19, 2010 (the "Interim Administrative Claims Bar Date") as the deadline by which parties must file administrative expense claims for amounts incurred in this Chapter 11 case through and including December 31, 2009 arising under 11 U.S.C. § 503(b). The Debtor has filed monthly operating reports commencing with the fiscal month ending January 9, 2009, and continues to file such reports.

## 3. The Official Committee of Unsecured Creditors

On or about January 5, 2009, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") to serve in this case [Docket No. 35]. The current members of the Committee and their email addresses are as follows: (1) BREF 333, LLC c/o Theresa Hoyt (thoyt@brookfield.com); (2) Williams Lea Inc. c/o Rylan Malerbi (Rylan.Malerbi@Williamslea.com); (3) William R. Mackey (WMackey732@aol.com); (4) Wondie Russell (wondie.russell@yahoo.com); and (5) Monika Pleyer Lee (monikalee@leelawlp.com).

## 4. Retention of Professionals

The Bankruptcy Court has authorized the Debtor to retain the following professionals:

- Pachulski Stang Ziehl & Jones LLP, as general bankruptcy counsel, which employment was approved on January 21, 2009;

- Greenberg Traurig LLP, as general bankruptcy co-counsel, which employment was approved on April 28, 2009;

SF:6747020.1 22

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

000027

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

- Manatt Phelps & Phillips, LLP, as special employment litigation counsel, which employment was approved on February 27, 2009;

- Howard Rice Nemerovski Canady Falk & Rabkin, as special counsel, which employment was approved on February 27, 2009 and was amended on January 28, 2010;

- Schiff & Hardin LLP, as special real estate counsel, which employment was approved on March 3, 2009;

- Olswang Solicitors, as special counsel, which employment was approved on March 3, 2009;

- Folger Levin & Kahn, as special malpractice counsel, which employment was approved on March 3, 2009;

- Lovitt & Hannan, Inc., as special litigation counsel, which employment was approved on March 3, 2009 and was expanded by order entered on March 1, 2010;

- The Adler Law Firm, as collections counsel, which employment was approved on April 28, 2009;

- Cohen Milstein Sellers & Toll PLLC, as special counsel, which employment was approved on July 2, 2009 *nunc pro tunc* to April 1, 2009;

- Orrick Herrington & Sutcliffe LLP, as special counsel in a matter pertaining to Resource Investments, Inc. and Land Recovery, Inc., which employment was approved on May 13, 2009;

- Trucker Huss APC, as special employee benefits counsel, which employment was approved on August 6, 2009;

- Eichstaedt & Devereaux LLP, as Debtor's tax advisors, which employment was approved on May 16, 2009;

- Saw Meng Tee & Partners PAC, as tax advisors for the Debtor's Singapore offices, which employment was approved on September 21, 2009;

- RPC Property Tax Advisors, LLC, as tax advisors to appeal an adverse property tax assessment by the City and County of San Francisco, which employment was approved on September 21, 2009;

- Clars Auction Gallery, as art appraiser, which employment was approved on March 31, 2009;

- Bonhams, as the auctioneer for the sale of the Debtor's fine art collection, which employment was approved on October 19, 2009 and amended on November 6, 2009;

- Bercik & Roberts, LLP, as the Debtor's tax advisor in connection with the formulation and preparation of a plan of liquidation and disclosure statement and to provide general tax advice, which employment was approved on November 17, 2009;

- Yudin & Yudin PLLC, as the Debtor's New York collections counsel, which employment was approved on December 1, 2009;

- John S. Pierce of Barger & Wollen, as an expert witness for the Debtor in the area of legal fees, which employment was approved on December 2, 2009;

Case: 08-32514    Doc# 1153    Filed: 05/25/10    Entered: 05/25/10 14:07:51    Page 28
of 80

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

23

DOCS_SF:67872.20

000028

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

- • Wondie Russell, as the Debtor's special counsel in connection with the preparation and submission of the fee petition in the *American Council of the Blind vs. Astrue and Social Security Administration* matter and to provide related services in connection therewith, which employment was approved on December 14, 2009;

- • Fox, Wang & Morgan as special employment litigation counsel (to replace Manatt Phelps & Phillips, LLP), which employment was approved on January 21, 2010.

The Bankruptcy Court authorized the Committee to retain Felderstein, Fitzgerald, Willoughby & Pascuzzi, LLP as its legal counsel by order entered on January 30, 2009 and authorized the Debtor and the Committee to employ Development Specialists, Inc. ("DSI") as joint financial advisors to the Debtor and the Committee by order entered on March 9, 2009.

On or about April 5, 2010, the Committee filed its Application to Employ McGrane Greenfield LLP as Special Litigation Counsel and to Approve a Combination Flat Fee and Contingency Fee Agreement Under Section 328 of the Bankruptcy Code, which sought to have the McGrane Greenfield firm begin working immediately on the Bank of America Preference Action. At a hearing held on April 13, the employment of the McGrane Greenfield firm was approved.

### 5.    Entry of Key Employee Retention Plan Order

On March 4, 2009, the Court authorized the Debtor to pay certain retention bonuses and incentive payments to key non-insider employees as compensation for the performance of critical functions with respect to the wind down of the Debtor's business, in such amounts agreed upon by the Debtor and the Committee.

### 6.    Disposition of Unexpired Real Property Leases

On January 28, 2009, the Court approved the Debtor's motion to reject its lease and sublease of Los Angeles office space, approved a compromise of controversy with the Los Angeles landlord and authorized the Debtor to sell certain furniture, fixtures and equipment free and clear of liens, claims, encumbrances and other interests. On May 30 and June 2, 2009, the Court authorized a three-part transaction between the Debtor and its landlord, 333 Bush Associates NF L.P., pursuant to which the Debtor assigned a sublease to such landlord, rejected its lease pursuant to a written stipulation, and executed a new short term tenancy agreement with the landlord for reduced space.

On August 26, 2009, the Court authorized the Debtor to assume and assign to Winston & Strawn, LLP, the Debtor's Beijing office lease and Shanghai office lease and certain executory contracts and licenses. The Court has also approved a compromise of controversy with a Seattle landlord and authorized the Debtor to reject certain other office leases and subleases and abandon personal property at some of the leased locations.

### 7. <u>Client File Disposition Procedures</u>

As a result of the wind-down and prior thereto, substantially all of the Debtor's attorneys became affiliated with other law firms.  In all cases, as each attorney transferred to other firms, that attorney's open client files were transferred as well.  However, during the Debtor's 118-plus year history, over 190,000 closed client files have been retained and stored by the Debtor, in some manner, for various reasons, including compliance with applicable rules of professional responsibility.  On May 7, 2009, the Court entered an order authorizing the Debtor to dispose of client files pursuant to certain procedures intended to provide notice and an opportunity for the Debtor's former clients to retrieve their files in accordance with applicable rules of professional responsibility and to minimize cost of file storage, retrieval and destruction costs to the estate.

### 8. <u>Authorization of Committee to Pursue Certain Estate Causes of Action</u>

Pursuant to orders entered on April 21, 2009 [Docket No. 366] and March 25, 2010 [Docket No. 1018], the Bankruptcy Court authorized the Committee to file and to pursue the categories of claims (the "Estate Representative Claims") set forth below on behalf of the estate.  Each of these potential claims is discussed in greater detail in Section IV of this Disclosure Statement (Identification of Litigation Claims).

a. *Preference claims versus Bank of America and/or Citibank.*  Potential claims based on any avoidable transfer actions that the Debtor may have against Bank of America and Citibank for pre or post-petition avoidable transfers, including related claims for recovery or turnover of property and disallowance of claims until such recovery pursuant to 11 U.S.C. § 502(d), based upon the circumstances set forth above in Section IV of this Disclosure Statement (the "Bank Claims").

b. *Jewel v. Boxer* Claims.  Potential claims against certain former attorneys under the partnership doctrines set forth in *Jewel v. Boxer*, 156 Cal. App. 3d 171 (1984), who (i) were

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

employed by the Debtor, (ii) substituted as attorney of record, either individually or as part of a law firm, in place of the Debtor after the Debtor adopted its Plan of Dissolution as of September 26, 2008 and ceased to provide legal services to clients on matters, and (iii) collected and/or will collect fees for services performed on such matters. On April 21, 2009, the Court entered an order authorizing the Committee to pursue the Estate Representative Claims on behalf of the estate.

c.  _Overdistribution Claims_.  Potential claims against Former Shareholders (including those who were officers or served on the Heller Policy Committee in connection with decisions made in 2007 and 2008) relating to (a) amounts paid to the Shareholders in December 2007 and thereafter and (b) other decisions leading to the adoption of the Plan of Dissolution and the subsequent bankruptcy filing (the "Overdistribution Claims").

d.  _Business Interference Claims_.  Potential claims against Covington & Burling and Former Shareholders who practiced in Heller's Intellectual Property Practice Group regarding their interference with the prospective economic advantage of the Debtor with respect to a potential merger with an international law firm and the firm's ability to complete its representation of former clients (the "Covington Claims").

e.  _Professional Negligence Claims_.  Potential claims arising from, _inter alia_, Greenberg Traurig's alleged failure to conduct lien perfection searches in connection with its representation of the Debtor (the "Greenberg Claims").

f.  _Katz Claims_.  Potential claims to recover a contingent fee for work performed for former client Katz and sums for services arising from that representation that may have been provided by successor firms, including Covington & Burling and Cooley Godward.  This litigation includes the prosecution of a claim objection to the proofs of claim filed by A2D, L.P. and Ronald A. Katz Technology Licensing, L.P. (the "Katz Claims").

## 9.  **The Joint Investigation Agreement**

In addition to the Estate Representative Claims discussed above, the estate may have other causes of action requiring the investigation and evaluation of claims against third parties arising out of the facts and circumstances related to the Debtor's dissolution (the "Potential Claims").

000031

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

In order to avoid the duplicate cost of having the Committee and the Debtor conduct the same claim investigations and to address the Committee's concern as to possible conflicts of interest on the part of the Debtor, on or about July 29, 2009, the Debtor and the Committee filed their *Joint Motion for Approval of Joint Investigation Agreement and Application to Expand Employment of Lovitt & Hannan, Inc. as Special Litigation Counsel* seeking authorization to expand the retention of Lovitt & Hannan, Inc. ("L&H"), a firm that had already been retained as special litigation counsel to the Debtor and with extensive experience in bankruptcy claims investigation, professional negligence, banking and commercial law, and complex commercial litigation, to include discovery duties in connection with the Estate Representative Claims and the investigation of Potential Claims.

On July 17, 2009, the Court entered its order expanding the retention of L&H. The order contains further rulings addressing third party attorney-client privilege issues in connection with the Debtor's former client files. The Debtor and the Committee subsequently entered into that certain Claims Prosecution Memorandum of Understanding dated as of February 25, 2009 which, among other things, establishes a protocol for the selection of counsel to prosecute the litigation described above. The Claims Prosecution Memorandum of Understanding was approved by the Bankruptcy Court on March 25, 2010 [Docket No. 1018].

### 10. <u>Wind Down of the Retirement Plan</u>

The Debtor was the contributing sponsor, as defined by 29 U.S.C. § 1301(a)(13), and the plan sponsor, as defined by 29 U.S.C. § 1002(16)(B), of the Heller Ehrman LLP Retirement Plan (Amended and Restated Effective January 1, 2007), EIN/PN 94-1217308/006 (the "<u>LEO Plan</u>"); and is the contributing sponsor and plan sponsor of the Heller Ehrman LLP Floor Pension Plan, EIN/PN 94-1217308/007 (the "<u>Floor Plan</u>") (collectively, the "<u>Pension Plans</u>"). The Floor Plan is a single-employer plan covered by Title IV of the Employment Retirement Income Security Act of 1974 ("ERISA"), *as amended*, 29 U.S.C. §§ 1301–1461, which created a mandatory pension plan termination insurance program administered by the Pension Benefit Guaranty Corporation ("PBGC"). PBGC is a wholly owned United States Government corporation that guarantees the payment of certain benefits upon termination of a pension plan covered by Title IV of ERISA.

Case: 08-32514    Doc# 1153    Filed: 05/25/10    Entered: 05/25/10 14:07:51    Page 32
of 80

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

DOCS_SF:67673.20

27

000032

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Under ERISA, the contributing sponsor of a pension plan covered by Title IV of ERISA and each member of its "controlled group" are jointly and severally liable for certain obligations relating to such plan. For purposes of ERISA, a "controlled group" is determined pursuant to 29 U.S.C. § 1301(a)(14).

Pursuant to the Plan of Dissolution, the Dissolution Committee was appointed to, among other things, serve as the administrator of the LEO Plan. The members of the Dissolution Committee were participants in the LEO Plan, as were certain senior employees of the Debtor. As of the Petition Date, the LEO Plan's assets had a value of approximately $45.5 million.

A Notice to Terminate the LEO Plan was served on April 28, 2009. On or about July 31, 2009, the LEO Plan's assets were liquidated, and, on August 18, 2009, the Court authorized the Debtor to transfer and assign the plan administrator obligations from the Dissolution Committee to Keith Betzina, an employee benefits attorney at the Davis, Wright & Tremaine law firm in San Francisco and former Heller Ehrman attorney, to avoid any potential conflicts of interest. To date, all of the assets of the LEO Plan have been distributed and the plan has been terminated as a standard termination under Section 4041(b) of ERISA.[1]

PBGC has filed estimated, contingent proofs of claim against the Debtor for: (1) the unfunded benefit liabilities of each Pension Plan under 29 U.S.C. § 1362(b); (2) the statutorily required minimum funding contributions due to each Pension Plan under 26 U.S.C. §§ 412(c)(11) and 430 and 29 U.S.C. § 1082(c)(11); and (3) the insurance premiums with respect to each Pension Plan under 29 U.S.C. § 1306(a)(3) and (a)(7) (collectively, the "Pension Claims"). As the LEO Plan was terminated via a standard termination, PBGC and the Debtor will stipulate to deem as withdrawn the Pension Claims that relate to the LEO Plan.

The Pension Claims that relate to the Floor Plan are: (i) a contingent claim (Claim 630-1) for unpaid minimum funding contributions under 26 U.S.C. §§ 412, 430 and 29 U.S.C. §1082, (ii) a contingent claim (Claim 628-1) for unfunded benefit liabilities under 29 U.S.C. §§ 1362, 1368, and (iii) a claim in the amount of $802,500.00 (Claim 601-1) for Termination Premiums that would

---

[1] The Debtor agreed to appoint the Committee as Estate Representative for the purpose of alleging any claims the Estate might have had against the LEO Plan, which appointment was approved by the Court on September 29, 2009 [Docket No. 668]. The Committee has since abandoned the estate's claims against the LEO Plan [Docket 821].

SF58585-001\DOCS_SF:67475.20    28    DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF LIQUIDATION

000033

allegedly be owing if the Floor Plan is terminated in a distress termination under 29 U.S.C. § 1341(c), or in a PBGC-initiated termination proceeding under 29 U.S.C. § 1342 (collectively, the "Floor Plan Claims"). PBGC alleges that the Floor Plan Claims are entitled to priority under section 507 (a) of the Bankruptcy Code and/or are entitled to administrative expense status under Bankruptcy Code section 503(b). The Debtor believes that to the extent that it has any liability on the Floor Plan Claims, the Claims will be Class 7 General Unsecured Claims not entitled to priority and/or administrative status. However, under the Plan, the Liquidating Debtor will reserve for the portions of the Pension Claims that relate to the Floor Plan that PBGC asserts are entitled to priority and/or administrative status, until any objections to the Floor Plan claims are resolved or such claims are estimated at a reduced amount due to their contingent status.

Unless and until the Floor Plan Claims are resolved by agreement with the PBGC or Bankruptcy Court order, nothing in this Chapter 11 proceeding, this Disclosure Statement, the Plan, or any order confirming the Plan shall be construed as discharging, releasing, or relieving the Debtor, or any other person or entity, in any capacity, from any liability with respect to the Floor Plan under any law, governmental policy, or regulatory provision.

### 11. The Biggers Adversary Proceeding and Settlement

On March 31, 2009, a class action complaint styled *Biggers, et al v. Heller Ehrman LLP* (Case No. 09-03058) was filed in the Bankruptcy Court. The Complaint (as subsequently amended) alleges that the Debtor and certain other defendants (the "Non-Debtor Defendants'): (1) violated the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 *et seq.*, and the California Worker Adjustment and Retraining Notification Act, California Labor Code §§ 1400 et seq (together the "WARN Act"); (2) failed to pay accrued, vested and unused vacation in violation of California law; (4) failed to pay wages under Washington law; (5) breached written contracts with employees in Washington and New York; (6) failed to pay wages under Washington, D.C. and New York law; (7) committed unfair business practices under California law; and (8) owed penalties as a result of the alleged failure to pay wages.

As a result of Debtor's alleged failure to pay accrued, vested and unused vacation at the time of layoff, the affected employees have a priority claim pursuant to § 507(a)(4) of the Bankruptcy

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  Code against the Debtor consisting of their vacation pay accrued during the one hundred eighty days

2  (180) prior to October 31, 2008, the date the Debtor ceased doing business, up to $10,950.00 per

3  individual, inclusive of all other priority claims.  As a result of Debtor's alleged violation of the

4  WARN Act by ordering plant closings and/or mass layoffs without providing sixty (60) days of

5  advance notice thereof, the affected employees have an alleged priority claim pursuant to § 507(a)(4)

6  of the Bankruptcy Code against the Debtor consisting of their total wages and benefits for the sixty

7  (60) day violation period, up to $10,950.00 per individual, inclusive of all other priority claims.  As a

8  result of Debtor's alleged failure to pay wages pursuant to contract, the affected employees have an

9  alleged priority claim pursuant to § 507(a)(4) of the Bankruptcy Code against the Debtor consisting

10 of their unpaid wages other than vacation during the one hundred eighty days (180) prior to October

11 31, 2008, the date the Debtor ceased doing business, up to $10,950.00 per individual, inclusive of all

12 other priority claims.

13        The Debtor and Non-Debtor Defendants deny the material allegations of the complaint and

14 have asserted multiple affirmative defenses during the course of negotiations with Class Counsel,

15 including the "unforeseeable business circumstances," the "faltering company," and the "good faith"

16 defenses.  The Debtor raised the following issues in discussions with Class Counsel, among others:

17 (a) whether the Debtor provided adequate notice to the Plaintiff Class Members; (b) whether such

18 notice was defective; (c) whether the Debtor was entitled to give less than sixty (60) days' notice

19 because of reasonably unforeseeable business circumstances; (d) whether the Debtor was entitled to

20 give less than sixty (60) days' notice because, at the time notice would have otherwise been required,

21 it was seeking new capital or business that it reasonably believed, if obtained, would have obviated

22 or substantially postponed the plant closing or mass layoff; (e) whether such search for new capital

23 or business was commercially reasonable under the circumstances; (f) whether the Debtor has other

24 defenses to the application of the WARN Act; (g) whether the employment losses suffered by the

25 aggrieved employees were caused by the Debtor's failure to obtain capital or business; (h) whether

26 the Debtor gave "as much notice as is practicable"; (i) whether the Debtor is entitled to a defense of

27 "good faith"; (j) the computation of the amount of damages; (k) whether the Debtor is entitled to set-

28 offs against damages for sums paid pre-petition and post-petition to employees; (l) whether

DOCS_SF:67479.9    DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

000035

attorneys' fees are to be awarded to the Plaintiff Class Representatives and the Plaintiff Class Members if they prevail and whether such fees are entitled to administrative priority; and (m) whether the damages are entitled to administrative priority under § 503(b)(1)(A), wage or benefit priority under §§ 507(a)(4) or (5), or are to be treated as general unsecured claims.

On or about October 8, 2009, the Debtor, the Committee, the Non-Debtor Defendants and the Plaintiff Class Representatives agreed to a settlement of the Biggers Adversary, which was preliminarily approved by the Bankruptcy Court on November 3, 2009. The Biggers Settlement Agreement creates three distinct subclasses among the Plaintiff Class Members:

     1.     The first subclass (the "WARN Classes") is made up of all employees of the Debtor who the Debtor terminated on, or within 30 days of, October 10, 2008 pursuant to the dissolution and mass layoff, and who did not receive 60 days of notice prior to their termination. The WARN Classes members include all of the Debtor's employees (secretaries, paralegals, associates, and administrative personnel) so terminated other than employees who are not entitled to participate in the Biggers Settlement Agreement because: (i) they voluntarily resigned from their employment with the Debtor or were terminated for cause or good reason; or (ii) they released the Debtor from any and all claims arising out of their employment other than in connection with the Plan; or (iii) they did not work in a Heller Ehrman LLP office that employed at least 50 full-time employees; or (iv) they suffered no economic WARN damages as a result of their termination. The WARN Classes do not include any employees of the Debtor who held the title "Of Counsel" or "Senior Of Counsel," unless otherwise identified on Exhibit A of the Biggers Settlement Agreement.

     2.     The second subclass (the "Vacation Classes") is made up of all of the employees of the Debtor who the Debtor terminated after September 26, 2008 pursuant to the dissolution and mass layoff that took place on or about October 10, 2008 and thereafter, and who are owed monies in accordance with accrued, vested and unused vacation at the time of termination. The Vacation Classes include all of the Debtor's employees (secretaries, paralegals, associates, and administrative personnel) terminated in connection therewith other than employees who are not entitled to participate in the Biggers Settlement Agreement because (i) they released the Debtor from any and all claims arising out of their employment other than in connection with the Plan; or (ii) they had no accrued vacation at the time of their termination. The Vacation Classes do not include any employees of the Debtor who held the title "Of Counsel" or "Senior Of Counsel," unless otherwise identified on Exhibit A of the Biggers Settlement Agreement.

     3.     The third subclass (the "Unpaid Wages Class") is made up of all of the employees of the Debtor who the Debtor terminated after September 26, 2008 pursuant to the dissolution and mass layoff, and who are owed monies in accordance with sabbatical, wage and/or non-discretionary bonus contracts. The Unpaid Wages Class includes all of the Debtor's employees (secretaries, paralegals, associates, and administrative personnel) terminated in connection therewith other than employees who are not entitled to participate in the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 08-32514    Doc# 1153    Filed: 05/25/10    Entered: 05/25/10 14:07:51    Page 36 of 80
DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF LIQUIDATION
31
DOCS_SF:67672.20

000036

Biggers Settlement Agreement because (i) they released the Debtor from any and all claims arising out of their employment other than in connection with the Plan; (ii) they had no contract with the Debtor for wages; or (iii) they had no contract with the Debtor for payment of a non-discretionary bonus, or had not satisfied the conditions precedent of such a contract; or (iv) they had no vested sabbatical entitlement. The Unpaid Wages Class does not include any employees of the Debtor who held the title "Of Counsel" or "Senior Of Counsel," unless otherwise identified on Exhibit A of the Biggers Settlement Agreement.

The Biggers Settlement Agreement and the order sought from the Bankruptcy Court approving it also provides for (i) the appointment of the Plaintiff Class Representatives and (ii) the designation of Blum Collins LLP as counsel to the Plaintiff Class Members. There are numerous conditions to the effectiveness of the Biggers Settlement Agreement, including but not limited to the Court approval of the settlement, participation of at least 75% of the Class Members and the Confirmation of the Plan.

Plaintiff Class Members who <u>do not</u> opt out of the Biggers Settlement Agreement are eligible to participate in the settlement, and will receive the following treatment upon the Effective Date (as defined in the Biggers Settlement Agreement):[1]

*Vacation Claims: (i)* An aggregate total priority wage claim of $2,994,456.80 as allowed priority claims pursuant to section 507(a) (4) of the Bankruptcy Code with each Plaintiff Class Member having an individual allowed priority claim under section 507)(a)(4) of the Bankruptcy Code pursuant to the schedule attached as Exhibit A of the Biggers Settlement Agreement on account of accrued, vested and unused vacation claims earned between May 4 and October 31, 2008, up to the lesser of (i) $10,950 (the "Priority Wage Cap") or (ii) the Plaintiff Class Member's scheduled claim for accrued, vested and unused vacation as set forth in the Debtor's schedules. These claims are treated as Class 1 (Priority Employee Claims) under the Plan. (ii) An aggregate total general unsecured claim of $4,201,395.17 with each Plaintiff Class Member having an individual allowed general unsecured claim in the amounts set forth on Exhibit A to the Biggers Settlement Agreement**,** on account of allowed accrued, vested and unused vacation claims, to be paid

---

[1] The description of the proposed Biggers Settlement Agreement is only a summary. In the event of any difference between this summary and the terms of the Biggers Settlement Agreement, the terms of the Biggers Settlement Agreement shall control. A copy of the Biggers Settlement Agreement is attached to the Plan as Exhibit D.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 08-32514  Doc# 1153  Filed: 05/25/10  Entered: 05/25/10 14:07:51  Page 37
of 80    32
DOCS_SF:67472.20    DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

000037

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

as and when the claims of other general unsecured creditors are paid, if so paid, pursuant to the Plan. These claims are treated as Class 7 (General Unsecured Claims) under the Plan.

*WARN Claims:* (i) An aggregate total priority wage claim of $1,500,000.00 as allowed priority claims pursuant to section 507(a)(4) of the Bankruptcy Code with each Plaintiff Class Member having an individual allowed priority claim under section 507(a)(4) of the Bankruptcy Code pursuant to Exhibit A to the Biggers Settlement Agreement on account of alleged WARN Damages. These claims are treated as Class 2 (Biggers Priority Employee Claims) under the Plan. (ii) An aggregate total allowed general unsecured claim of $2,350,000.00 with each Plaintiff Class Member having an individual allowed general unsecured claim in the amounts set forth on Exhibit A to the Biggers Settlement Agreement, on account of alleged WARN Damages, to be paid as and when the claims other general unsecured creditors are paid, if so paid, pursuant to the Plan. These claims are treated as Class 7 (General Unsecured Claims) under the Plan.

*Unpaid Wage Claims (Other Than Vacation):* (i)An aggregate total priority wage claim of $66,970.24 as allowed priority claims pursuant to section 507(a)(4) of the Bankruptcy Code with each Plaintiff Class Member having an individual allowed priority claim under section 507(a)(4) of the Bankruptcy Code pursuant to Exhibit A to the Biggers Settlement Agreement, on account of alleged unpaid wages (other than vacation). These claims are treated as Class 1 (Priority Employee Claims) under the Plan. (ii) An aggregate total allowed general unsecured claim of $920,183.33 with each Plaintiff Class Member having an individual allowed general unsecured claim in the amounts set forth on Exhibit A to the Biggers Settlement Agreement, on account of alleged unpaid wages (other than vacation) to be paid as and when the claims of other general unsecured creditors are paid, if so paid, pursuant to the Plan. These claims are treated as Class 7 (General Unsecured Claims) under the Plan.

*Waiting Time Penalties/Damages:* (i) An aggregate total allowed subordinated general unsecured claim of $7,000,000.00 with each Plaintiff Class Member having an individual allowed subordinated general unsecured claim in the amounts set forth on Exhibit A to the Biggers Settlement Agreement, on account of alleged waiting time penalties. These claims are treated as

Class 8 (Subordinated Biggers Unsecured Claims) under the Plan and are subordinate to the payment of all Administrative Claims, Secured Claims, Unclassified Claims and the Claims of Classes 1-7.

The Biggers Settlement Agreement contains, among other things, the following additional provisions:

*The Substantial Contribution Payment*: An administrative claim of $950,000.00 to Class Counsel in satisfaction of attorneys' fees and costs to Class Counsel and as a "substantial contribution" pursuant to section 503(b)(3)(D)(4) of the Bankruptcy Code. The Debtor contemplates that this payment will be made in August 2010 and has included the expenditure in its Post Confirmation Budget (**Exhibit B).**

*Opt-Outs*: In the event that any Plaintiff Class Member opts-out, such opting out Plaintiff Class Member shall not be entitled to any rights or benefits under the Biggers Settlement Agreement and shall not be bound by the terms thereof and shall retain all rights, if any against the Debtor, the Non-Debtor Defendants and the Defendant Shareholder Class; *provided however that they will receive their allowed claims for accrued, vested and unused vacation and unpaid wages, as set forth in Exhibit A to the Biggers Settlement Agreement, even if they opt out, as long as the Plan is confirmed.*

*Release & Termination*. Upon final approval by the Bankruptcy Court, the Settlement will result in the dismissal of the Biggers Adversary on the merits and with prejudice to all Plaintiff Class Members who do not Opt-Out of the Biggers Settlement Agreement, and shall constitute a broad release by each such Plaintiff Class Member of all claims against the Debtor, the Non-Debtor Defendants, the Defendant Shareholder Class, and their respective estates. Any individual proofs of claim filed by any Plaintiff Class Member that asserts claims that are released by the Biggers Settlement will be deemed withdrawn and disallowed and will not receive any further distribution or payment. Additionally, the Plaintiff Class Proof of Claim will be deemed withdrawn and disallowed and will not receive any further distribution or payment. A Plaintiff Class Member who timely opts-out out of the Biggers Settlement Agreement shall have the right to file an individual proof of claim setting forth, on an individual basis, the same claims as were set forth in the Class Proof of Claim.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  Such individual proof of Claim shall be deemed timely filed only if it is filed no later than thirty

2  days after entry of the Final Judgment in the Biggers case.

3       The Bankruptcy Court entered its order preliminarily approving the Biggers Settlement

4  Agreement on April 5, 2010 [Adversary Docket No. 58].  On April 9, 2010, 2010, the Debtor served

5  the Notice to Plaintiff Class of: (A) Proposed Settlement of Class Action Concerning Wage Claims;

6  (B) Certification of Class for Settlement Purposes Only; (C) Appointment of Class Counsel and

7  Class Representatives; (D) Date of Court Hearing for Final Approval of Proposed Settlement; E)

8  Right to Object to the Settlement and To Appear At Court Hearing, and (F) Right of Class Members

9  to Opt Out Of The Class Action (the "Class Notice"). The deadline to opt-out of the Biggers

10  Settlement was May 13, 2010, and the hearing on final approval is scheduled for July 8, 2010.

11            **12.    Other Postpetition Activities**

12       In addition to the activities enumerated above, the Debtor has continued its liquidation of the

13  Estate's Assets and the resolution of Claims.  Specifically, the Debtor has resolved or/or objected to

14  the claims of numerous Creditors (including significant claims filed by Integrated Economic

15  Solutions and The Claro Group), sold assets (including its collection of contemporary art at auction),

16  initiated numerous adversary proceedings, reached settlements with creditors Hartford Fire

17  Insurance Company [Docket No. 716], Metastorm, Inc. and Obagi Medical Products, Inc. [Docket

18  No. 723], Ernst & Young LLP, Hynix Semiconductor, Inc. and Mosel Vitelic, Inc. [Docket No. 863],

19  Municipal Mortgage & Equity [Docket No. 653], California Business Interiors, Inc. d/b/a/ Hogue &

20  Associates [Docket No. 790].

21       In addition, on April 14, 2010, the Debtor filed a Motion to Sell Furniture, Fixtures,

22  Equipment and Artwork Free and Clear of Liens, Claims, Encumbrances and Other Interests, as well

23  as a companion Motion to Approve Compromise of Controversy with Former Washington, D.C.

24  Landlord.  Both motions were approved at a hearing that took place on April 23, 2010.  On May 6,

25  2010, the Debtor objected to the proof of claim filed by 333 Bush Associates NF, L.P.  If successful,

26  such objection would reduce the Claimant's Claim by approximately $2.3 million

27       Finally, on April 21, 2010, the Court entered an Agreed Order Establishing Procedures for

28  Judicial Settlement Conference which related to a pending dispute between the Plan Proponents and

certain retired Former Shareholders regarding the shareholders' Claims for approximately $8.55 million in the aggregate under the Heller Ehrman LLP Retirement System. Although one day of mediation with the assistance of the Honorable Randall J. Newsome has since taken place, the disputes are not yet resolved.

<div align="center">

**IV.**

**IDENTIFICATION OF LITIGATION CLAIMS**

</div>

The Debtor's Estate includes claims and/or causes of action that the Debtor has or may have against various third parties. These are known in the Plan as the Retained Claims and Defenses. As was noted above, the Debtor has assigned the right to pursue numerous of these claims to the Committee to investigate and prosecute. This Article IV provides a description of the Retained Claims and Defenses identified by the Committee. **The Debtor has not conducted an independent investigation of these claims and has instead deferred to the Committee with regard to the statements proffered in this section. Nor does the Debtor join in these statements in Article IV.**

A.     **The Bank of America Preference Action**

The Committee filed the Bank of America Preference Action as the estate representative for the Debtor on April 23, 2009, alleging that pursuant to Section 547(b) of the Bankruptcy Code, approximately $56 million in payments to Bank of America and Citibank should be returned to the Estate because they were transfers made on account of an antecedent debt within the 90 days preceding the filing of the bankruptcy at a time when the Debtor was insolvent, and allowed defendants Bank of America and Citibank to receive more than they would have received in a chapter 7 case had the Banks not improved their position to that of a perfected secured creditor in such 90 day period.

The Committee contends that the Banks filed a statement terminating their UCC-1 security filing on or about August 3, 2007. The Banks claim that the filing of the Termination Statement was a result of clerical error and they should be treated as secured creditors. An attempt was made to resurrect the Banks' security position on October 1, 2008, when the Banks filed a so-called Correction Statement in an attempt to continue in effect the Original Financing Statement dated January 3, 1991. Further, on October 2, 2008 a new "original" financing statement was recorded by

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the Banks, with descriptive language in effect claiming that such document reaffirmed the 1991 filing and that the 1991 filing continued in effect.

The Banks also contend that they have a defense based on the structure and operation of Heller Ehrman law firm and its relationship to the Heller Ehrman PCs. The Heller Ehrman PCs, plus other parties related to the Debtor, executed a guaranty of the Banks' loan to the Debtor and executed a security interest in the assets of the Heller Ehrman PCs. As a result, among other defenses, the Banks argue that the October 1 and 2 filings did not improve the Banks' collateral position because the termination statement filed on August 3, 2007 related solely to the Debtor, while the perfected lien position against the Heller Ehrman PCs remained unaffected. The Banks contend that any assets of the Heller Ehrman PCs remained collateral in which the Banks held a perfected security interest, which continues even if such collateral was transferred by the Heller Ehrman PCs. There are other defenses that the Banks raise, which are reflected in the answer to the Bank of America Preference Action.

The parties have been engaged in extensive document discovery, primarily involving the digitally maintained records of Heller Ehrman LLP and Bank of America. It is possible that the Committee or the Liquidating Debtor may uncover facts during the course of discovery, which could lead to additional claims being filed against Bank of America and/or Citibank and/or their counsel on various grounds, including but not limited to equitable subordination and/or lender liability based on the control exercised over the liquidation of the Debtor by agents of Bank of America and/or Citibank and/or Bank of America's counsel to the detriment of the Debtor and its creditors.

The Committee intends to aggressively litigate the Bank of America Preference Action. The outcome is uncertain, and the claim arises out of unique circumstances. Therefore, it is impossible at this stage for the Committee to estimate its overall chances of prevailing. If the Committee ultimately prevails, the Banks should have to repay the sums paid during the preference period, although the Banks would then be entitled to a Class 7 General Unsecured Claim under Bankruptcy Code section 502(h) and be able to share in distributions to the same extent as other Class 7 Creditors, unless those claims are subordinated. From the Debtor's perspective, a best case scenario

Case: 08-32514    Doc# 1153    Filed: 05/25/10    Entered: 05/25/10 14:07:51    Page 42 of 80
SF_DOCS_SF:67417.20
37
DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

000042

would result in an approximately $60,000,000.00 recovery against the Banks which would, once paid, entitle the Banks to a $60,000,000.00 Class 7 General Unsecured Claim.

**B.** **Former Shareholder Settlement Process**

The Committee's investigation into payments made to Heller Ehrman PCs for the benefit of the Former Shareholders has caused it to conclude that valid claims exist against the Former Shareholders and/or the Heller Ehrman PCs for receipt of payments that should be recoverable for the benefit of the estate under several different legal theories, including but not limited to that such payments are avoidable as constructive fraudulent conveyances. The payments involved include the annual bonus paid to them in December 2007 in the amount of approximately $76.5 million, plus as much as $8 million paid to departing partners in 2008. In addition, the Committee seeks to recover all additional sums paid to Former Shareholders in 2008 during the time period that the Debtor was insolvent or had unreasonably small capital. All of these payments are believed to have been made to the Heller Ehrman PCs, each of which was then obligated to make payments, and did make payments, to the individual Former Shareholders. The contentions of the Former Shareholders and/or the Heller Ehrman PCs regarding these claims are not presently known, however vigorous opposition is anticipated.

To date, no lawsuit has been filed with respect to these claims. However, the Debtor and the Committee participated in a mediation with many of the Former Shareholders before the Chief Bankruptcy Judge of the United States Bankruptcy Court for the Northern District of California, Randall J. Newsome on three dates in the Fall of 2009 with several groups of represented Former Shareholders and continued into 2010 with another mediation with a three additional Former Shareholders.

The Committee's settlement model has evolved through the mediation process and is premised upon what the Committee currently believes is a conservative approach intended to give former Shareholders an incentive to settle now or soon in order to avoid burdensome and costly litigation. The only legal theory upon which the settlement model is based is constructive fraudulent conveyance. The Committee is not waiving or conceding in any way any other potential legal theory for recovery against the Former Shareholders who do not elect to become Settling Former

DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF LIQUIDATION

38

000043

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Shareholders. Both the Bankruptcy Code and California's Uniform Fraudulent Transfer Act render a transfer voidable when two elements are met: (1) in making the transfer, the Debtor did not receive "reasonably equivalent value" ("REV"), and (2) the transaction resulted in the Debtor becoming insolvent (either in the "balance sheet" or "equitable" sense) or resulted in unreasonably small capital. 11 U.S.C. § 548(a)(1); California's Uniform Fraudulent Transfer Act ("UFTA"), Cal. Civ. Code § 3439 - 3439.12; Cal. Civ. Code §§ 3439.04, 3439.05, incorporated by section 544(b)(1) of the United States Bankruptcy Code. The question is simple. Did the Debtor receive "reasonably equivalent value" from the Former Shareholders in return for the distributions made to them when it had unreasonably small assets? The Committee's settlement model presumes that the "unreasonably small assets" or "equitable or balance sheet insolvency" element will be a contested issue, and as such, for this model only, the Committee is only evaluating distributions to Former Shareholders made approximately eight and half months prior to the Debtor's dissolution (i.e. distributions on or after December 31, 2007).

The actual settlement amounts in the Committee's settlement model are based on two factors: (1) the projected recovery of sums to individual Former Shareholders in excess of REV and (2) whether different categories of Former Shareholders are more or less likely to be able to assert a good faith defense to a constructive fraudulent conveyance claim. It is clearly established that payments made to Former Shareholders on account of a Former Shareholder's attributed equity ownership interest in Heller, and not in exchange for services rendered, were not made for value and hence were not made in exchange for reasonably equivalent value. *See In re Agricultural Research & Tech. Group. Inc*., 916 F.2d 528, 532 (9th Cir. 1990). If this proposition is accepted, all distributions of profits on or after December 31, 2007, by the Debtor to a Former Shareholder would be avoidable as constructive fraudulent conveyances as long as the Committee can demonstrate that on or after that date the Debtor had unreasonably small assets.

On the other end of the spectrum, certain represented Former Shareholders in this case have argued that under *Annod Corp. v. Hamilton & Samuels et al*., 100 Cal. App. 4th 1286, 123 Cal. Rptr. 2d 924 (4th App Dist. 2002), all of the distributions that they received in 2007 and 2008 are properly characterized as compensation for services rendered and none should be attributed to any profits.

68685-001\DOCS_SF:67372.9                            DISCLOSURE STATEMENT IN SUPPORT OF
39                                 JOINT PLAN OF LIQUIDATION

000044

This argument, however, ignores the reality of how the Debtor (and other large law firms) operated. It is undisputed that the Debtor made profits and that these profits were funneled down to the Former Shareholders through a complex system set up by these same Former Shareholders to accomplish this result. Some part of the distributions received by the Former Shareholders has to comprise these profits. The only dispute is how large is that profit number. That will be a question for the jury or court to determine.

The Committee submits that even if a court or a jury rejects the Committee's various claims that all distributions were on account of profits or return of capital, the *Annod* case lays out the model for how to determine what portion of distributions to partners for constructive fraudulent conveyance purposes is available to be counted as REV. In *Annod*, a landlord commenced an action against the partners of a dissolved law firm alleging both intentional and constructive fraudulent conveyance. The partners had continued to work for the firm during the relevant periods and had continued to receive reduced draws during this period. In granting summary judgment for the partners the trial court stated:

> [Moving partners] provided 'reasonably equivalent value' for the draws which they received by continuing to work substantial hours after [sic] H&S [Hamilton & Samuels] during the entire period from August 1995 through February 1996, by generating receivables in excess of the modest draws which they received and by leaving substantial assets, including cash income, in the firm which were then available to satisfy the claims of its creditors. The efforts of the [moving partners] during this period resulted in an increase in the amount of cash which was available to creditors over the amount which would have been available if they had ceased working on behalf of the firm in September 1995.

*Annod*, 123 Cal. Rptr. 2d at 931. There are many key facts that differ between the *Annod* and the Debtor's case, which display why, in the Debtor's case, REV was not provided by the Former Shareholders, whereas in *Annod*, the court held that REV had been provided. For example:

| Annod | Heller |
|---|---|
| " . . . the draws taken by the former partners, or alternatively, withdrawals from capital taken by the former partners were less than the income credited to each former partner's capital account in 1995 and 1996." *Annod* 123 Cal. Rptr. 2d at 930. | In December 2007, the Debtor distributed $9.5 million in excess of 2007 profits, while failing to pay $13 million in claims to creditors that would have further reduced 2007 profits. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| Annod | Heller |
|---|---|
| " . . . partners made such an effort to increase funds available to creditors that at times Hamilton & Samuel employees, including some of the secretaries, were being paid more than the partners." *Id.* at 931 | The lowest draw by any Former Shareholder in 2008 is believed to have been multiples higher than the highest compensated secretary at the Debtor during the relevant period. |
| "The efforts of the [moving partners] during this period resulted in an increase in the amount of cash which was available to creditors . . ." | With the Debtor, the opposite was true. Debt expanded throughout the period in a failed strategy to attract a merger partner largely for the benefit of the Former Shareholders, but paid for by the creditors. |
| " . . . the draws [from August 1, 1995, forward] were for a substantially lesser amount than those taken for previous periods;" *Annod* 123 Cal. Rptr. 2d at 930. | No reduction in base salary occurred at all in 2008. In contrast, base salary had just been increased in January 2007 by $1 million per month and in spite of the liquidity crisis in 2008, the Debtor did not even reduce the draws back to the pre-2007 amounts. |

Neither *Annod*, nor any other relevant authority establishes exactly what the minimum requirements are for REV. It is very helpful, however, in establishing what does satisfy the REV test, and the Committee has applied it in a way that leaves plenty of margin for error in satisfying the fact test set forth in the statutes and jury instructions.

In applying the statements of the court in *Annod*, the Committee has developed an *"Annod REV Model,"* which examines each Former Shareholder's billings less overhead for each distribution period and then calculates whether or not a particular Former Shareholder added additional value for the Debtor or took profits away from the Debtor during the relevant period. Even if a Former Shareholder was profitable, each Former Shareholder received funds in excess of REV in the amount of each Former Shareholder's attributed share of the $9.5 million over-distribution that took place in December 2007, which was labeled by the Debtor's auditors as a "loan to shareholders."

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:67676.20

000046

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

If a court or jury determines that the Estate received less than REV in return for a specific transfer to a Former Shareholder, then the Former Shareholder, as an initial transferee,[2] will be liable for the entire amount of each distribution received, without regard to any value that the Former Shareholder may have provided in exchange for the distribution. *Schafer v. Las Vegals Hilton Corporation*, 127 F.3d 1195, 1197-1198 (9th Cir. 1957) (" right to recover from an initial transferee is absolute"). Only if the Former Shareholder is able to prove up a good faith defense under 11 U.S.C. § 548(a) ("a transferee . . . that takes [1] for value and [2] in good faith may retain the transferred interest to the extent that such transferee . . . gave value to the debtor in exchange. . . . .") would the damages be limited to the "profit" portion as opposed to the total amount of the distributions. *See Hayes v. Palm Seedlings Partners (In re Agricultural Research & Tech. Group. Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990).

The following table presents an example of how the Committee's *Annod* REV Model operates with respect to a hypothetical Former Shareholder X who did not receive a return of capital and owed no notes to the Debtor:

| Shareholder X | *Annod* REV Model | | |
|---|---|---|---|
| | 2007 | 2008 | *Profits Distributed* |
| Actual Billings: | $1,320,000 | $820,000 | |
| Less Cost of Attorney Overhead | ($320,000) | ($220,000) | |
| *"Annod* Measure of REV" | $1,000,000 | $600,000 | |
| Less Compensation Paid: | ($1,600000) | ($500,000) | |
| *"Annod* REV Model Damages" (assumes good faith defense applies) | ($600,000) | 0 | $600,000 |

---

[2] Although the payments technically "passed through" the Heller Ehrman PCs, these corporate entities had no right under the Partnership Agreements to do anything but pass the money received along to the Former Shareholders in accordance with the dictates of the LLP Policy Committee, making the Heller Ehrman PCs mere "conduits" that do not qualify as "transferees" under federal bankruptcy law. The Former Shareholders were thus the initial (and in fact only) transferees. *See Universal Serv. Admin. Co. v. Post-Confirmation Comm. (In re Incomnet)*, 463 F.3d 1064 (9th Cir. 2006) (a transferee must have the right to put the money to its own purposes, to use the funds as it sees fit).

DOCS_SF:67478.20

42

000047

In the above example, in 2007, Former Shareholder X is presumed by the *Annod* REV Model to have received $600,000 of profit. In 2008, under this model, it is presumed that Former Shareholder X received no share of the profit as part of the distributions to Former Shareholder X. If Former Shareholder X can establish a good faith defense, his/her liability if a court rejects the Committee's assertions that all distributions are on account of profits will be limited to $600,000.

After the calculation of the *Annod* REV Model damages (for Former Shareholder X above), the Committee then applied a settlement percentage to reduce the total settlement amount. The settlement percentages are based on the Former Shareholder's income category and whether the Former Shareholder was a member of the policy committee or in senior management. The four categories are: (1) senior management; (2) members of policy Committee on or as of December 31, 2007; (3) Former Shareholders with 2007 compensation in excess of $575,000, and (4) Former Shareholders with 2007 compensation less than $575,000. The settlement percentages are detailed in the following chart for the *Annod* REV Model damages, the return of capital damages, and note payable damages.

| PROPOSED FINAL SHAREHOLDER SETTLEMENT MODEL | *Annod* REV Measure Damages | Return of Capital | Outstanding Shareholder Notes |
|---|---|---|---|
| | Proposed Settlement Percentages* | Proposed Settlement Percentages* | Proposed Settlement Percentages* |
| Senior Management | ____% | ____% | ____% |
| Policy Committee: | | | |
| >$575K | ____% | ____% | ____% |
| <$575K | ____% | ____% | ____% |
| Other Term Shs | ____% | ____% | ____% |

* Percentages are confidential and are under seal. Creditors who do not present conflicts and who agree to execute a non-disclosure statement may be provided the documents that have been filed under seal in support of the approval of this settlement model.

For Former Shareholder X above, who was in the over $575,000 category, but who is presumed to not have been on the policy committee or in senior management, the settlement amount would be the *Annod* REV Model Damages $600,000 multiplied by the under seal percentage "X",

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

000048

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

which equals the Committee settlement offer of "Y," which amount will only be provided to the specific Shareholder and/or his counsel. The Committee has reached the economic terms of settlements with approximately 135 Former Shareholders for a total settlement amount of approximately $7,000,000. The Former Shareholders who elected to settle early generally participated in the settlement process through various group settlements (there were a few individual settlements with represented Former Shareholders). The Committee has granted these early settling Former Shareholders a 20% discount off the amounts that would otherwise be produced pursuant to the foregoing described settlement model. This discount was based on negotiated settlements and was granted in consideration of the significant amount of attorneys' fees and costs expended by the early settling Former Shareholders, which while contentious, was vital to the Committee's development of this settlement model. The Committee believes that many if not most of the early settling Former Shareholders have generally expended more in attorneys' fees than the 20% discount.

The Committee (and not the Debtor) has adopted the following two prong procedure for the resolution of certain claims against Former Shareholders assigned to the Committee during the Chapter 11 case:

(a) As and when the Proponents solicit votes on the Plan, and excepting the Top Thirty Former Shareholders, those Former Shareholders who have not previously agreed to terms with the Committee may receive, at the Committee's discretion, a Former Shareholder Settlement Letter outlining the terms (including the amount that must be paid to the Estate as a Former Shareholder Settlement Payment) under which the Committee is prepared to settle all of the estate's known and unknown claims against such Former Shareholder (except Jewel Claims, for which the Settling Former Shareholder shall receive a conditional covenant not to sue and excepting other specifically non-released claims). In order to participate in the settlement process under Article 5.12(a) of the Plan, a Settling Former Shareholder must: (i) Execute the Model Former Shareholder Settlement Agreement (a copy of which is attached to the Plan as **Exhibit L**), and (ii) Pay the Estate the Former Shareholder Settlement Payment -- such payment to be received by the Estate on or before ten business days prior to the date first set for a Plan Confirmation Hearing.

SF_DOCS_SF:674720.2

44

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

000049

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(b) The Top Thirty Former Shareholders shall receive a grouped settlement offer nine business days prior to the date that the Plan is first set for a Confirmation Hearing, and this offer shall be subject to an overall participation requirement of 90% in dollar amount of all other Former Shareholders who received offers pursuant to section (a) above before any Top Thirty Former Shareholder settlement will be deemed accepted and approved under the Plan.  Notwithstanding the foregoing, the Committee shall maintain the right to waive such participation requirement on a blanket basis and/or negotiate individual settlements with specific Former Shareholders in the Top Thirty.  This participation requirement will not affect those Former Shareholders who are not Top Thirty Former Shareholders.

The Model Former Shareholder Settlement Agreement also contains protections for Settling Former Shareholders from claims asserted by third parties – particularly the Banks.  The Committee considered whether the Banks "veil piercing" theories have any merit, and concluded that they do not.  The Committee's position is that the Debtor was a Limited Liability Partnership under California law, and even if the Former Shareholders were somehow deemed to be partners of the Debtor, partners of LLP's do not have personal liability for claims – except for certain specified claims, such as their own individual malpractice.

The protections begin with a payment plan; all settlements require at least a 67% upfront payment prior to Plan Confirmation and two equal installment payments, which payments may be used to defend claims asserted against an individual Settling Former Shareholder.  Additionally, if the Estate prevails on its claims against the Banks, up to $6,000,000 of the recoveries will be available if the Banks elect to pursue the Settling Former Shareholders. The protections contained in the Model Former Shareholder Settlement Agreement will generally provide as follows but the actual document attached to the Plan as Exhibit L shall control:[3]

1. As part of any settlement of the Estate's claims against the Banks or either of them the Estate shall obtain contemporaneously therewith an unqualified general release by the Banks of all claims that the settling Banks may have related to or arising from any relationship between the Banks and Heller LLP and/or the Heller Affiliates or their respective predecessor entities against (i) Settling Former Shareholder and (ii) each of the Heller Affiliates.

---

[3]  The definitions for the terms in this section are contained in the Model Former Shareholder Settlement Agreement, which is attached to the Plan as **Exhibit L.**

RLF1-3685489\01\DOCS_SF:67470.20    45    DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

000050

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

2. As part of any settlement of (i) any claim against Heller LLP in the amount of $250,000 or more asserted by any person or entity ("Claimant") other than the Banks; (ii) any claim asserted by the Estate in the amount of $250,000 or more against any third party ("Defendant") which claim is resolved by execution of an agreement containing an exchange of releases; or (iii) any claim by a former employee of Heller LLP who opts out of the Biggers settlement class ("Biggers Opt Out"), (iv) lessors of office space occupied by the Estate on September 15, 2008 and (v) each of the retired shareholders who was represented by Michael St. James on November 12, 2009, the Estate shall obtain a release by the Claimant or Defendant of any and all claims that such Claimant or Defendant might have against (1) Settling Former Shareholder to the extent such claims are predicated on (a) Settling Former Shareholder's former employment or shareholder relationship with Heller LLP or any of the Heller Affiliates, or (b) the transaction or payment which is the subject of the Estate Claim(s) settled with Heller LLP, and (2) each of the Heller Affiliates, on whatever basis such claim is founded.

3. In the event Settling Former Shareholder breaches his or her payment obligations as set forth in this Agreement, then such breaching Settling Former Shareholder shall have ten (10) days to cure such breach after the mailing of written notice to Settling Former Shareholder at the address set forth in paragraph 15 by U.S. Mail, with a copy by email if an email address is included in paragraph 15. If Settling Former Shareholder fails to timely cure the default, this Agreement shall serve as a confession to judgment, and the Estate may move by Motion in the Bankruptcy Case for entry of Judgment in the amount of any outstanding obligations due under this Agreement, including interest at the applicable legal rate.

4. If any person or entity not a party to this Agreement asserts a claim against Settling Shareholder related to or arising from any employment by or relationship between Heller LLP, the Heller Affiliates or their respective predecessor entities and the Settling Shareholder in his or her capacity as one of the above named entities' partner, shareholder, manager, agent or employee, prior to the time he or she is obligated to pay the portion of the Settlement Amount described in paragraphs 6A and 6B, above, Settling Shareholder may use the amount of the Settlement Payment not yet paid to Heller LLP or its successor under the Plan, together with all accrued interest thereon, to defend such claim if Heller LLP or its successor under the Plan has not assumed the defense of such claim or to settle such claim; provided, however, that Settling Shareholder need not tender his or her claim hereunder unless such Settling Shareholder has received a writing giving him or her adequate assurance that the claim will be handled appropriately under the circumstances, which assurance will include the identification of counsel to handle the claim, an approximate budget for counsel, and identification of all actual or potential conflicts as between counsel and any other parties represented by counsel. Amounts used by Settling Shareholder to defend and/or settle such third party claim shall offset, dollar for dollar, and thereby reduce, any remaining payment obligation of Settling Shareholder to Estate under paragraphs 6A and 6B, above, including interest thereon. Prior to any defense or settlement of such third party claim, Settling Shareholder shall serve notice on the Estate or its successor under the Plan of the third party claim against Settling Shareholder and shall provide a reasonable opportunity to Estate or its successor under the Plan to assume the defense and settlement of the third party claim on behalf of Settling Shareholder, or to seek and obtain a temporary injunction under Bankruptcy Code §105 to stay such litigation.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

5. Estate shall seek and use its best efforts to include in the Plan a temporary injunction under Bankruptcy Code §105 to prevent the filing of any action (or to stay any then pending action) filed by the Banks against Settling Shareholder predicated in whole or in part on Settling Shareholder's former employment by or shareholder status with Heller LLP or any of the Heller Affiliates, with such injunction to remain in effect until the final resolution of the pending preference action brought by the Estate against the Banks, whether by settlement or entry of judgment no longer subject to any pending or possible appeal; provided, however, that should the Plan confirmed by the Bankruptcy Court not include such temporary injunction, then, in the event the Banks file an action against Settling Shareholder prior to the Termination Date for Payments predicated in whole or in part on Settling Shareholder's former employment by or shareholder status with Heller LLP or any of the Heller Affiliates, the Estate, upon receipt of written demand by Settling Shareholder, shall promptly move the Bankruptcy Court for issuance of such temporary injunction, to remain in effect until the final resolution of the pending preference action brought by the Estate against the Banks, whether by settlement or entry of judgment no longer subject to any pending or possible appeal.

6. To the extent that Heller LLP and/or any Heller PC defends a claim asserted against it, which claim is also asserted against Settling Shareholder, Heller LLP and/or the Heller PC, as the case may be, shall defend Settling Shareholder with respect to such claim at no cost to Settling Shareholder, provided that (a) such defense does not materially increase the cost to Heller LLP and/or the Heller PC of defending against or resolving the claim; and (b) Settling Shareholder executes such waivers of conflict of interest as may be required to assure that Heller LLP and/or Heller PC will not be deprived of its or their future choice of defense counsel. This obligation exists only so long as the defense does not materially increase the cost to Heller LLP and/or the Heller PC of defending such claim or claims.

7. If the Estate or its successor under the Plan obtains a recovery (by settlement, trial or otherwise) from the Banks (net of attorneys' fees, costs and then due Plan Expenses as that term is defined under the Plan) (the "Bank Proceeds"), then, within 30 days of receipt of the Bank Proceeds, Estate or its successor under the Plan shall deposit into the Defense Fund the lesser of (a) the Bank Proceeds, (b) the total amount paid in settlement to the Estate by Settling Shareholders, or (c) $6,000,000, provided, however, that no such deposit shall be required if the recovery of Bank Proceeds is accompanied by the delivery of releases as described in paragraph 9A of this Agreement.

8. The Defense Fund shall be used only to defend Settling Shareholders against claims by the Banks (x) based on or arising from allegations that the Heller LLP or the Heller Affiliates were insolvent throughout the period beginning no later than December 31, 2007 and ending no earlier than August 1, 2008, or on any date during that period that is relevant to a claim that is made against any Settling Shareholder; (y) based on allegations that some or all aspects of the structure of the Heller LLP or any of the Heller Affiliates should be disregarded or collapsed such that former shareholders are personally liable for debts of the LLP or the PCs; (z) other claims arising out of any Settling Shareholder's involvement with Heller LLP, the Heller Affiliates, or their predecessors, but only to the extent that those other claims do not materially increase the cost of defense beyond the cost of defending claims defined in (x) and (y), all such claims (x), (y) and (z) referred to, collectively, hereafter as "Covered Claims."

Case: 08-32514   Doc# 1153   Filed: 05/25/10   Entered: 05/25/10 14:07:51   Page 52
of 80
DOCS_SF:67070.20   47   DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

000052

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

9. The Defense Fund shall be held by the Estate for the potential defense of Settling Shareholders under the provisions of this Agreement until the Termination Date for Payments. After the occurrence of the Defense Fund Relinquishment Date (as defined in paragraph 9J), the Plan Administrator shall serve notice to the Fund Steering Committee of its intent to assume control over and close the Defense Fund and shall give the Fund Steering Committee 30 days' notice to file a motion objecting to such action. The Parties agree to submit to the Bankruptcy Court by motion any dispute regarding whether or not the Defense Fund Relinquishment Date has occurred.

10. The Fund Steering Committee shall consist of one representative of the group of former shareholders represented as of the Initial Payment Date by Wendel Rosen Black & Dean, LLP, one from the group of former shareholders represented as of the Initial Payment Date by Friedman, Dumas & Springwater, and one from the group of former shareholders represented as of the Initial Payment Date by Jones Day. The Fund Steering Committee shall act by unanimous vote and shall select one law firm to represent all Settling Shareholders against all such claims and shall offer that representation to all Settling Shareholders. Nothing shall prevent any Settling Shareholder from retaining separate counsel, at his or her own expense (but subject to such Settling Shareholder's rights, if any under paragraph 9E, above), in the sole discretion of such Settling Shareholder. Upon the later to occur of (a) the Termination Date for Payments or (b) October 15, 2012 (hereafter, the "Defense Fund Relinquishment Date"), the Fund Steering Committee shall immediately relinquish control over the Defense Fund to the Plan Administrator, provided, however, that if any litigation is pending against Settling Shareholder as of such date arising out of or related to a Covered Claim, then the Defense Fund Relinquishment Date shall not occur until final resolution of such litigation, whether by settlement or entry of judgment no longer subject to any pending or possible appeal. The Fund Steering Committee shall submit an account with invoices of all payments from the Defense Fund to the Plan Administrator to assist the Plan Administrator in filing taxes for the periods that the Fund Steering Committee has control over the Defense Fund.

11. If Settling Shareholder incurs costs to defend against a Covered Claim before the Defense Fund is funded ("pre-funding Defense Expenses") then, upon funding of the Defense Fund, the Estate or its successor under the Plan shall promptly reimburse Settling Shareholder for Settling Shareholder's pre-funding Defense Expenses. In the event the Defense Fund contains insufficient funds to reimburse all Settling Shareholders for their pre-funding Defense Expenses, then all Settling Shareholders entitled to reimbursement of such defense expenses shall receive reimbursement in proportion to the pre-funding, Defense Expenses each incurred.

**C.** **Intellectual Property Contingent Fee Representation of Ronald A Katz Technology Licensing LP; and A2D Licensing Technology LP ("Katz")**

The Committee has investigated the right of the Debtor to recover a contingent fee for work performed for former client Katz. On August 18, 2006 the Debtor entered into a letter agreement under which the firm agreed to represent Katz entities in a series of matters involving Katz's

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION
SF:67876.20                    48
000053

enforcement of intellectual property rights against a broad array of alleged infringers. The

agreement (as modified) calls for a yearly payment for four years (2006, 2007, 2008 and 2009), and

a contingent interest in successful recoveries that is not due until November 2010, or the conclusion

of all the cases, whichever is earlier. Katz has filed a claim in the bankruptcy seeking recovery of

apparently unrelated payment for a vendor product and a claim for damages caused by an alleged

breach of the representation agreement when the Debtor ceased to represent Katz at the end of

September 2008. This breach of contract claim is apparently based upon allegations that Katz was

forced to incur additional expense, and will continue to incur such expense, in obtaining replacement

legal services. Initially these services were provided by the lawyers who provided legal

representation at the Debtor, and moved to Covington & Burling as described above, but it is further

claimed that due to conflicts of interest Katz retained another firm, Cooley Godward Kronish LLP,

and incurred additional expenses. To the extent the services may have been provided by Former

Shareholders at Covington & Burling, or Cooley Godward, the Committee believes it should be

entitled to recover sums arising from that representation. The outcome on these potential claims is

uncertain at this early stage, and it is not possible at present for the Committee to estimate either the

overall chances to prevail on liability, or the range of damages.

### D. Potential lawsuit against certain Former Shareholders who practiced in the Intellectual Property portion of the Debtor.

The Committee's investigation into the facts and circumstances surrounding the departure of

the Debtor's former intellectual property practice group has revealed that potential claims based

upon breach of fiduciary duty may exist against certain lawyer members of that group. The

leadership of the intellectual property practice group, particularly Robert Fram, Alan Blankenheimer

and Robert Haslam, were shareholders. Mr. Fram was a member of the Debtor's Policy Committee,

the governing body in 2007 and 2008, and Mr. Blankenheimer was appointed to the Policy

Committee on January 1, 2008. Mr. Haslam was directly involved with the leadership of the Debtor,

and particularly in connection with merger negotiations with various potential merger partners,

including negotiations with Mayer Brown LLP. After the heart of the intellectual property practice

group announced it would not participate in a merger with Mayer Brown at the end of August 2008

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

000054

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(and that it was leaving to join Covington & Burling and a few other firms), the anticipated merger with Mayer Brown fell apart and The Debtor was forced to notify the Banks that it was in breach of its loan covenants. That breach was a direct result of the departure of the heart of the intellectual property practice group. At the time, Mayer Brown was very actively engaged in a growth strategy. In 2007, Mayer Brown established an alliance with Ramon & Cajal, a Spanish law firm, opened a Hong Kong office, and an office in Sao Paulo. In 2008, Mayer Brown combined with JSM, a leading Asia law firm. The collapse of the negotiations with Mayer Brown, after the announced departure of the heart of the intellectual property practice group, allegedly precipitated the failure of the Debtor.

The Committee's investigation to date has also revealed that potential claims may exist against certain former lawyer members of the Debtor's intellectual property practice group who interfered with the prospective business advantage of the Debtor in connection with the claims discussed above concerning the right of the Debtor to recover a contingent fee for work performed for former client Katz, and the claim that Katz has filed in the bankruptcy seeking recovery of damages caused by the alleged breach of the Katz representation agreement discussed above. Assuming that a breach of contract did occur, the Committee's investigation has revealed that the failure of the Debtor to carry its representation of Katz to completion may have been caused by the action of the members of the intellectual property practice group, together and in conjunction with persons from Covington & Burling, and possibly others (see discussion under Covington & Burling below) in precipitating the failure of the Debtor as discussed above.

The outcome on these potential claims is uncertain, and it is not possible at present for the Committee to estimate either the overall chances to prevail on liability, or the range of damages.

**E.**     **Potential lawsuit against Covington & Burling LLP and possibly others**

The Committee's investigation has unearthed indications that the key leaders in the Debtor's Intellectual Property Practice Group may have begun negotiations with Covington & Burling before their announced departure at the end of August 2008. These negotiations involved Former Shareholders Haslam, Fram, Blankenheimer, and Sturge Sobin, among others. During the period of the negotiations, the leaders of the intellectual property practice group were prophetically told that

the departure of the heart of their group would almost surely lead to the failure of the Mayer Brown merger deal. The intellectual property practice group was a major contributor to the Debtor's revenue, contributing almost $40 million in annualized revenue, and a loss of that magnitude made the Debtor a much less attractive merger candidate. On or about Sunday, August 10, 2008, Fram and Blankenheimer withdrew from a telephone conference involving the key members of the Debtor's Policy Committee, when the subject matter of return of capital contributions to departing shareholders arose. Later, they revealed they had already been consulting legal counsel. Messrs. Fram and Blankenheimer also announced their intention to resign from the Policy Committee on or about August 10th.

An order has been entered under Bankruptcy Rule 2004 for the examination by the Debtor of documents (including digital data) in the possession of Covington & Burling. Covington & Burling has moved for relief from this order. Discussions with Mayer Brown regarding examination by the Debtor of Mayer Brown documents and digital data and access to relevant witnesses are in progress.

The facts developed through investigation to date support an inference that Covington & Burling in combination with leaders of the Debtor's Intellectual Property Practice Group knowingly interfered with the prospective economic advantage of the Debtor in regard to the proposed merger with Mayer Brown and otherwise, and that this interference may have precipitated the failure of the Debtor and been responsible for the Debtor being unable to carry out to completion its representation of its former clients, including Katz as discussed above. The outcome on these potential claims is uncertain, and it is not possible at present for the Committee to estimate either the overall chances to prevail on liability, or the range of damages.

### F. Potential lawsuit against Greenberg Traurig, LLP

The Committee's investigation into the legal representation of the Debtor by Greenberg Traurig LLP has caused it to conclude that a valid claim exists against Greenberg Traurig, LLP. Greenberg Traurig and the Debtor entered into a legal representation letter dated June 11, 2008 pursuant to which Greenberg Traurig was to advise "in connection with [Heller Ehrman's] current partnership agreement and matters relating to its affairs, including potential issues regarding a combination and/or restructuring." One of the first tasks a law firm, possessing ordinary skill and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

capacity in connection with advising on a potential combination, or restructuring, would do at the outset of representation is to conduct a security-filings search. Not later than early August 2008, the work performed by Greenberg Traurig expanded to include legal services involving dissolution. Once again those services also required a security-filings search. Greenberg Traurig failed to conduct such a search. If it had done so, it would have learned, as more fully described above, that Bank of America and Citibank had filed the termination statement related to their security filing as to the Debtor in August of 2007.

Because this information was not obtained, the Banks were able to file the Correction Statement and to make a new filing at the first of October 2008, before the Debtor learned of the termination. Armed with the knowledge of the termination, and properly advised by counsel hired in connection with combinations, restructuring and dissolution, the Committee believes that the Debtor would have been in a position to negotiate effectively with the Banks and better control the fate of the firm, its finances and its clients. As things played out, the Banks were able to take control of nearly all of the Debtor's accounts receivable and force a disorderly short term shut down of the firm that is believed to have adversely affected its ability to collect outstanding accounts receivables, as well as its ability to complete and be paid for work in progress, and to arrange for a orderly transition for its clients. To Greenberg Traurig's credit, it did advise the Debtor to try to negotiate an orderly liquidation, but due to the Greenberg Traurig's negligence, neither Greenberg Traurig nor the Debtor had enough negotiating leverage to cause the Banks to agree. The Committee believes that the Banks appear to have been entirely focused upon obtaining repayment of their loans and cutting off expenditures, because they could foresee enough money in accounts receivables to satisfy their loans once they had re-filed their UCC-1 financing statement.

Furthermore, had the Debtor been properly advised about the filing of the termination statement related to the UCC-1 filing, it could have elected to file bankruptcy at a much earlier date at a time before the Banks re-filed their financing statement. The Committee believes that would have accomplished two objectives. First, in the Committee's view, it would have unquestionably put the Banks in the position of general creditors, rather than secured creditors. Second, the Committee contends it would have reduced ongoing expenditures and thereby created more funds in the estate.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    Much work remains to be done regarding the analysis of damages flowing from the professional

2    negligence, and further fact development is likewise required. An agreement has been reached with

3    Greenberg Traurig for the production of relevant documents (including digital data) in its possession.

4           Greenberg Traurig denies the allegations against it contained in this Disclosure Statement

5    and further denies that there are any claims or causes of action against it.  To the extent that any

6    claims or causes of actions are pursued against Greenberg Traurig, the Plan Proponents have been

7    advised that Greenberg Traurig intends to vigorously defend against any such claims and causes of

8    action and expressly reserves any and all defenses, rights, claims and counterclaims.

9           The outcome on these potential claims is uncertain, and it is not possible at present for the

10   Committee to estimate either the overall chances to prevail on liability, or the range of damages.

11          **G.      Potential lawsuit against Ernst & Young**

12          The Committee believes that the Debtor may have been damaged by the professional

13   negligence of its auditor, Ernst & Young, in connection with the audit of the 2007 financial

14   statement.  Ernst & Young was engaged to perform a "non GAAP" audit of this statement for the

15   benefit of the Debtor.  Generally Accepted Accounting Principles ("GAAP") require that a

16   company's financial statements be audited in accordance with Generally Accepted Auditing

17   Standards ("GAAS").  While non-GAAP audits have become popular in recent years, in part due to

18   the likely lower cost for small businesses, and these audits require less formal and detailed work,

19   they still require performance of the audit in such a way that the client receives a reliable report and

20   opinion on its financial statements, and reasonable assurance about whether the financial statements

21   are free of material misstatement.  The opinion letter that the Debtor ultimately received included the

22   following statements:

23                  We have conducted our audits in accordance with auditing standards
                    generally accepted in the United States.  Those standards require that
24                  we plan and perform the audit to obtain reasonable assurance about
                    whether the financial statements are free of material misstatement.
25          And;

26
27                  In our opinion the financial statements referred to above present fairly,
                    in all material respects, the assets, liabilities, and partners' equity
                    arising from cash transactions of Heller Ehrman LLP at December 31,
28                  2007 and 2006, and its revenue collected, its expenses paid, and its

Case: 08-32514    Doc# 1153    Filed: 05/25/10    Entered: 05/25/10 14:07:51    Page 58
DOCS_SF:67470.2    of 80    53    DISCLOSURE STATEMENT IN SUPPORT OF
                                   JOINT PLAN OF LIQUIDATION

000058

cash flow for the years then ended on [a modified cash basis of accounting].

The investigation by the Committee to date leads it to conclude that the audit report is inaccurate in critical respects, and likely that the opinion letter should have been qualified. The financial statements contain a novel entry in the "Statements of Cash Flows" not previously present. That entry under "Investing activities" in the amount of $11,074,300 is entitled "Loans to partners". Since the Heller Ehrman PCs do not have substantial assets, and in fact paid out the "loan" amount to the Former Shareholders along with the year-end profits, this loan transaction appears to be a thinly-disguised improper device mostly used to overpay the Former Shareholders. The motivation for this overpayment appears to have been to reach a sufficiently high industry standard known as Profit Per Equity Partner ("PPEP") in order to preserve the Debtor's standing in the PPEP statistics kept on large law firms and to thereby create the false impression that the business was more successful and profitable than it was. The Committee believes that the financial statements may have inaccurately described the bank borrowings of the Debtor. The Committee believes that Ernst & Young waffled on the accounting treatment and on confirmation of the transactions in the audit process and the audit report. The Debtor was damaged by this conduct through both the payments to Former Shareholders in excess of its distributable net profits, and through permitting it to incur greater losses before its ultimate demise.

The Committee is further investigating whether issuance of an unqualified audit opinion was proper given not only the overpayments to shareholders, but also the relationship of bank borrowings to the past history of the Debtor. This would include an analysis of whether and in what way the audit opinion letter should have been qualified. By way of example, the Committee believes a proper analysis made in accordance with SAS 59 and AU 341 as to whether the Debtor was a going concern should have resulted in a qualification in the auditor's opinion letter. Because of the lag time between the conduct of the audit, the completion of field work, and the retroactive date of the opinion letter, there are issues to be further investigated concerning the elements of injury, damages and what steps should have been taken during the process of the audit to cause management to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    reduce losses to the Debtor.  An issue concerning withholding taxes paid by the Heller Ehrman PCs

2    has also arisen and requires further investigation.

3         The Committee has not attempted to outline the details of the potential claims against Ernst

4    & Young.  The outcome on these potential claims is uncertain, and it is not possible at present for

5    the Committee to estimate either the overall chances to prevail on liability, or the range of damages.

6        **H.**     **Claims to profits from unfinished business and business opportunities**

7         The Committee believes that valid claims exist to recover profits recognized by Former

8    Shareholders with respect to unfinished business and business opportunities pertaining to former

9    clients of the firm.  These claims arise under the holding of the California Court of Appeal decision

10   in *Jewel v. Boxer,* 156 Cal.App.3d 171 (1984).  The Jewel decision stands for the proposition that

11   unfinished business of a dissolving law partnership remains the property of the partnership in the

12   absence of a contrary agreement.  Furthermore, Section 1604(b)(1) of the Revised Uniform

13   Partnership Act ("RUPA") supports the same conclusion.  Effective as of September 26, 2008, the

14   Debtor adopted a Plan of Dissolution for itself and affiliated entities that provided for a waiver

15   (without mention of RUPA) of rights and claims under the doctrine of Jewel to seek payment of

16   legal fees generated after the departure date of any lawyer or group of lawyers with respect to non-

17   contingency/nonsuccess fee matters only.

18        Were it not for this waiver, at a minimum, profits from unfinished business subsequently

19   completed by Former Shareholders and entities they associated with that subsequently profited from

20   this business ("Successor Entities") would be owing to the Debtor.  The validity of this Jewel waiver

21   will be a contested matter in any action brought by the Debtor against these lawyers and Successor

22   Entities.  Even if the waiver is upheld, the Debtor will possess claims to recover profits from

23   unfinished business completed by Former Shareholders on a contingent fee basis.  In addition, the

24   Committee believes it is entitled to claim entitlement to recover for business opportunities arising

25   from these prior clients.

26        Even if the Jewel waiver were to be otherwise upheld, the Committee believes it is entitled to

27   recover from the Debtor's Former Shareholders because the waiver was an actual or constructive

28

DOCS_SF:67479.20

000060

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   fraudulent conveyance that is avoidable under Sections 542, 544(b)(1) and 550(a) of the Bankruptcy

2   Act, as well as California Civil Code Section 3439.07.

3       To the extent these claims are made against Former Shareholders, they may be included in

4   the mediation process referred to above.  To the extent they may involve Former Shareholder

5   members of the Intellectual Property Practice Group, and successor firms, including Covington &

6   Burling, and Cooley Godward, these claims will likely be pursued separately from the shareholder

7   mediation.  The outcome on these potential claims is uncertain, and it is not possible at present for

8   the Committee to estimate either the overall chances to prevail on liability, or the range of damages.

9       **I.      Qualcomm**

10      The Debtor possesses a potential claim against Qualcomm Incorporated ("Qualcomm"),

11  arising from Qualcomm's conduct in connection with a case filed in the United States District Court

12  for the Southern District of California styled as *Qualcomm Incorporated v. Broadcom Corp.* (the

13  "Broadcom Litigation"), Case Number 05CV1958-RMB (BLM).  Such claim is a product of the fact

14  that the Debtor incurred more than $2 million in legal expenses in defending the firm and its

15  attorneys who were accused of discovery abuse in the Broadcom Litigation.  In a series of opinions

16  issued by the magistrate judge, the court determined that no Heller Ehrman attorney had committed

17  discovery abuse.  Had Qualcomm been more forthcoming to its litigation counsel and

18  opponent during the Broadcom Litigation, the Debtor likely would not have been subject to the

19  sanctions originally imposed in the Broadcom Litigation (and would not have incurred more than $2

20  million in defense expenses).  A representative, but not exclusive, list of the potential claims for

21  relief the Debtor possesses against Qualcomm would include breach of the implied covenant of good

22  faith and fair dealing, negligence, misrepresentation, and negligent misrepresentation.  The outcome

23  on these potential claims is uncertain, and it is not possible at present for the Committee to estimate

24  either the overall chances to prevail on liability, or the range of damages.

25      **J.      Preservation of Other Causes of Action**

26      As of the Effective Date, each and every claim, right, cause of action, claim for relief, right to

27  set-off and other entitlement held by the Debtor whether arising under §§ 502, 506, 510, 541, 542,

28  543, 544, 545, 546, 547, 548, 549, 550, 551, 552 or 553 of the Code, or otherwise, other than those

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

SF-6747820

000061

waived or released by express terms of the Plan or the Confirmation Order, shall be deemed fully preserved and vested in the Liquidating Debtor. Without limiting the generality of the foregoing, any and all claims and causes of action held by the Debtor, the Debtor in Possession and/or the Committee prior to the Effective Date against any person or entity, including but not limited to the Heller Ehrman PCs, the Former Shareholders, any affiliates of the Debtor, and/or any officer, director, professional, or employee of the Debtor, shall be retained by the Liquidating Debtor. Such claims shall include but not be limited to any claims based on the facts and circumstances related in any way to the dissolution of the Debtor, and all avoidance actions for transfers made by the Debtors or any affiliates, including all claims, rights to recovery, or transfers disclosed in the statement financial affairs filed with the Court by the Debtor. Confirmation of the Plan effects no settlement, compromise, waiver, or release of any cause of action unless the Plan or Confirmation Order specifically and unambiguously so provides. The nondisclosure or nondiscussion of any particular cause of action is not and shall not be construed as a settlement, compromise, waiver, or release of such cause of action.

The Debtor and Liquidating Debtor also reserve the right to object to any of the Claims (regardless of whether the Claim was actually filed and classified as a Priority or Secured Claim) improperly asserted against the Debtor and its estate. As stated above, however, under the Plan all Retained Claims and Defenses (among other things) shall revest in the Liquidating Debtor on the Effective Date, including Avoidance Actions.

## V.

## SUMMARY DESCRIPTION OF THE PLAN

A discussion of the principal provisions of the Plan as they relate to the treatment of Classes of Allowed Claims and Interests is set forth below. The discussion of the Plan which follows constitutes a summary only and should not be relied upon for voting purposes. You are urged to read the Plan in full in evaluating whether to accept or reject the Plan proposed by the Proponents. If any inconsistency exists between this summary and the Plan, the terms of the Plan shall control.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

000062

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

### A. Description Of Classes

The Plan divides Creditors and Interest Holders into Classes. Creditors with similar Claims are placed in the same Class. There are nine (9) Classes of Claims and one (1) Class of Interests under the Plan as follows:

1. **Class 1 Claims.** Class 1 shall consist of all Priority Employee Claims.

2. **Class 2 Claims.** Class 2 shall consist of all Biggers Priority Employee Claims.

3. **Class 3 Claims.** Class 3 shall consist of all Priority Employee Benefit Claims.

4. **Class 4 Claims.** Class 4 shall consist of the Secured Claims of Bank of America and Citibank.

5. **Class 5 Claims.** Class 5 shall consist of the Secured Claim of MPC.

6. **Class 6 Claims.** Class 6 shall consist of Insured Malpractice Claims.

7. **Class 7 Claims.** Class 7 shall consist of General Unsecured Claims.

8. **Class 8 Claims.** Class 8 shall consist of all Biggers Subordinated Unsecured Claims.

9. **Class 9 Claims.** Class 9 shall consist of the claims of Subordinated Former Shareholders.

10. **Class 10 Interests.** Class 10 shall consist of the Interests held by the Interest Holders.

### B. Treatment Of Unclassified Claims

Article III of the Plan provides for the treatment of unclassified claims. The Plan sets forth the treatment of Administrative Claims (including Claims for Professional Fees) and Priority Tax Claims, which are not classified under the Plan.

1. **Administrative Claims.** The Plan contemplates that Allowed Administrative Claims will be paid in full by the Liquidating Debtor. Allowed Administrative Claims will be accorded the treatment specified in Article 3.1 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § A. The Plan also provides for an Administrative Claims Bar

000063

Date, which requires that all requests for payment of Administrative Claims, other than Claims for Professional Fees, must be filed by (i) March 19, 2010 for Claims arising before December 31, 2009 or (ii) the first Business Day that is thirty (30) days after the Effective Date for claims arising between January 1, 2010 and the Effective Date.  If an Administrative Claim is not filed by the applicable Administrative Bar Date, the holder thereof shall be forever barred from asserting such Administrative Claim against the Debtor or the Liquidating Debtor or from sharing in any distribution under the Plan.  Holders of Administrative Claims based on liabilities incurred in the ordinary course of the Debtor's business following the Petition Date shall not be required to comply with the Administrative Claim Bar Date, provided that, (i) such holders have otherwise submitted an invoice, billing statement or other evidence of indebtedness to the Debtor in the ordinary course of business, and (ii) such Claims are not past due according to their terms.  The Debtor estimates that Allowed Claims in this category will total approximately $300,000.00.

> **2.** **Administrative Claims (Professionals).**  The Plan contemplates that Allowed Claims for Professional Fees shall be paid in full by the Liquidating Debtor.  Allowed Claims of Professionals will be accorded the treatment specified in Article 3.3 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § B. Each party seeking an award by the Bankruptcy Court of Professional Fees: (a) must file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date on or before the Administrative Claims Bar Date; and (b) if the Bankruptcy Court grants such an award, each such party will be paid in full in Cash by the Liquidating Debtor in such amounts as are allowed by the Bankruptcy Court as soon thereafter as practicable.  All final applications for allowance and disbursement of Professional Fees must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order, and the Bankruptcy Court's Guidelines for Compensation and Expense Reimbursement of Professionals and Trustees.  The Debtor estimates that Allowed Claims in this category will total approximately $2,075,000.00.

> **3.** **Priority Tax Claims.**  The Debtor anticipates that the estate will be obligated to satisfy certain tax claims entitled to priority under section 507(a)(8) of the Bankruptcy Code.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Allowed Priority Tax Claims will be accorded the treatment specified in Article 3.4 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § C. The Debtor estimates that Allowed Claims in this category will total approximately $4,040,000.00.

### C. Treatment of Classified Claims and Interests

Article IV of the Plan sets forth the treatment of classified Claims and Interests. A summary of the treatment of classified Claims and Interests is also provided in the chart set forth in Section I of this Disclosure Statement. As set forth in the Plan and previously herein, Classes 4, 6, 7, 8, 9 and 10 are impaired and are entitled to vote on the Plan.

### 1. Secured Claims.

The Plan creates two (2) Classes of Allowed Secured Claims: Class 4 (Secured Claims of Bank of America and Citibank) and Class 5 (Allowed Secured Claim of MPC Insurance, Ltd.). The Plan treats them as follows:

(a) Class 4 (Secured Claims of Bank of America and Citibank)

Class 4 Claims are Disputed Claims. Allowed Class 4 Claims will be accorded the treatment specified in Article 4.4 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § G.

(b) Class 5 (Secured Claim of MPC)

Class 5 Claims are Disputed. MPC filed proof of claim number 604 in the amount of $57,881.94 plus contingent amounts, which is allegedly secured by a right of offset and perfected by a filed UCC-1. Allowed Class 5 Claims will be accorded the treatment specified in Article 4.5 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § H.

### 2. Unsecured Claims.

The Plan creates three Classes of priority employee claims: Class 1 (Priority Employee Claims), Class 2 (Biggers Priority Employee Claims); Class 3 (Priority Employee Benefit Claims), two Classes of non-priority unsecured claims: Class 6 (Insured Malpractice Claims) and Class 7 (General Unsecured Claims), and two Classes of subordinated unsecured claims: Class 8 (Subordinated Biggers Unsecured Claims) and Class 9 (Subordinated Former Shareholder Claims). The Plan treats these Claims as follows:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

###### (a) Class 1 (Priority Employee Claims)

The Plan contemplates that Allowed Priority Employee Claims will be paid in full by the Liquidating Debtor. The Debtor believes that some employee claims entitled to priority under section 507(a)(4) or (a)(5) of the Bankruptcy Code have already been paid by the Debtor pursuant to authority granted by the Bankruptcy Court in connection with relief granted pursuant to the First Day Pleadings (described in Section III of this Disclosure Statement). Allowed Class 1 Claims will be accorded the treatment specified in Article 4.1 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § D. The Debtor estimates that Allowed Claims in this Class will total approximately $3,382,000.00.

###### (b) Class 2 (Biggers Priority Employee Claims)

The Plan contemplates that Allowed Biggers Priority Employee Claims will be paid in full by the Liquidating Debtor. Allowed Biggers Priority Employee Claims will be accorded the treatment specified in Article 4.2 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § E. The Debtor estimates that Allowed Claims in this Class will total approximately $1,500,000.00.

###### (c) Class 3 (Priority Employee Benefit Claims)

The Plan contemplates that Allowed Priority Employee Benefit Claims will be paid in full by the Liquidating Debtor. Allowed Priority Employee Benefit Claims will be accorded the treatment specified in Article 4.3 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § E. The Debtor estimates that Allowed Claims in this Class will total approximately $700,000.00.

###### (d) Class 6 (Insured Malpractice Claims)

Insured Malpractice Claims are classified as Class 6 Claims under the Plan. The Debtor has insurance policies covering malpractice claims as set forth in Exhibit I to the Plan. Generally speaking, the Debtor's insurance structure remained consistent over the last decade. It had primary coverage with an independent insurer, such as Lexington Insurance Company ("Lexington) for ten million dollars ($10,000,000) for each claim and in the aggregate, with excess layers of coverage above that amount. Within each primary policy, Lexington (or the applicable insurer) required the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 08-32514   Doc# 1153   Filed: 05/25/10   Entered: 05/25/10 14:07:51   Page 66 of 80

DS_SF:67479.20   61   DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

000066

Debtor to pay first two million dollars ($2,000,000) incurred on any claim. This requirement was called the "Self Insured Retention" or "SIR". For example, the policy issued by Lexington for the year commencing April 15, 2008 provides: "That amount designated as the self-insured retention in the declarations shall apply to damages and claims expenses and shall be retained for the Insured's own account…." The SIR less the Malpractice Claim Expenses incurred constitutes the SIR Amount. The obligation of the primary insurer (e.g., Lexington) remains unchanged, namely to provide insurance coverage in excess of the SIR. Nothing herein or in the Plan provides any obligation or intent to incur or pay amounts that fall within the SIR. Through the Plan, the Plan Administrator will determine whether or not to incur Malpractice Claim Expenses within the SIR, and act accordingly, without any obligation to pay any SIR or to comply with any other obligations under the insurance policies.

The Debtor is treating the Insured Malpractice Claims as follows. Such claims are impaired and shall be paid solely from the available insurance proceeds of any applicable Malpractice Policy. No holder of an Allowed Class 6 Claim shall receive any distribution from Available Cash on account of such Class 6 Claim. If any portion of the Allowed amount of a Malpractice Claim is greater than the SIR, the Claim will be bifurcated and treated in two different classes as follows: (a) the amount of the Allowed Claim that is greater than the SIR will be a Class 6 Insured Malpractice Claim; and (b) the amount of the Allowed Claim that is less than or equal to the SIR Amount will be a Class 7 General Unsecured Claim. For example, assume the SIR equals $2,000,000.00 and there are $500,000.00 of Malpractice Claim Expenses related to a Malpractice Claim that is ultimately allowed in the amount of $6,000,000.00. The SIR Amount is $1,500,000.00 (i.e., the SIR - the Malpractice Claim Expenses). The Allowed amount of the Claim that is greater than the SIR (i.e., $6,000,000.00-$ 2,000,000.00 =$4, 000,000.00) is a Class 6 Insured Malpractice Claim. The amount of the claim that is equal to or less than the SIR Amount (i.e., $1,500,000.00) will be a Class 7 General Unsecured Claim. Any Malpractice Claim that is Allowed in an amount that is less than the SIR shall not fall within Class 6, but shall be instead a Class 7 General Unsecured Claim. For example assume the SIR equals $2,000,000.00 and there are $500,000.00 of Malpractice Claim Expenses related to a Malpractice Claim that is ultimately allowed in the amount of $1,400,000.00.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

In this instance the SIR Amount is $1,500,000.00. Since the Allowed amount of the Claim is less than the SIR, the Claimant will have a Class 7 General Unsecured claim for $1,400,000.00. In no event shall a Malpractice Claim treated as a Class 7 General Unsecured claim be allowed in an amount in excess of the SIR. Any Malpractice Claim that is Allowed in an amount that is less than the SIR shall not fall within Class 6, but shall be instead a Class 7 General Unsecured Claim.

There is no guarantee that the applicable insurer(s) will provide the insurance coverage necessary to create a recovery on an Allowed Class 6 Claim. It is possible that the applicable insurer(s) will deny coverage or that the insurer will otherwise be unable or unwilling to satisfy an Allowed Class 6 Claim. Nevertheless, Creditors with Class 6 Claims shall have no recourse to Class 7 for amounts unpaid on account of an Allowed Class 6 Claim.

(e)     Class 7 (General Unsecured Claims)

The Plan also provides for the treatment of holders of Claims in Class 7 (General Unsecured Claims). Any Malpractice Claim that is Allowed in an amount that is less than the SIR shall not fall within Class 6, but shall be instead a Class 7 General Unsecured Claim. For example assume the SIR equals $2,000,000.00 and there are $500,000.00 of Malpractice Claim Expenses related to a Malpractice Claim that is ultimately allowed in the amount of $1,400,000.00. In this instance the SIR Amount is $1,500,000.00. Since the Allowed amount of the Claim is less than the SIR, the Claimant will have a Class 7 General Unsecured claim for $1,400,000.00. In no event shall a Malpractice Claim treated as a Class 7 General Unsecured claim be allowed in an amount in excess of the SIR. Allowed Class 7 General Unsecured Claims will be accorded the treatment specified in Article 4.7 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § J. The Debtor estimates that Allowed Claims in this Class will range from approximately $95,000,000.00-$155,000,000.00 depending on the success of objections to Claims and the Bank of America Preference Action.

(f)     Class 8 (Subordinated Biggers Unsecured Claims)

Class 8 consists of all Biggers Subordinated Unsecured Claims. Allowed Biggers Subordinated Unsecured Claims will be accorded the treatment specified in Article 4.8 of the Plan,

which terms are reprinted in the Treatment of Claims Chart, *supra*, at § K. The Debtor estimates that Allowed Claims in this Class will total approximately $7,000,000.00.

(g)     Class 9 (Subordinated Former Shareholder Claims)

Class 9 consists of all Subordinated Former Shareholder Claims. Allowed Class 9 Subordinated Former Shareholder Claims will be accorded the treatment specified in Article 4.9 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § L. The Debtor estimates that Allowed Claims in this Class will total approximately $4,849,000.00.

**3.     Class 10 (Interest Holders)**

Class 10 consists of all holders of Interests in the Debtor. No distribution is expected to be made to Interest Holders. Allowed Class 10 Interests will be accorded the treatment specified in Article 4.10 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § M.

**D.     Implementation of the Plan.**

Article V of the Plan provides the principal means for the implementation of the Plan. The Plan shall be implemented on the Effective Date as set forth in the Plan. The Plan provides for, among other things, the revesting of Estate Assets in the Liquidating Debtor (Plan at Articles 5.2, 8.2), the funding of the Liquidating Debtor with the Exit Financing (Plan at Article 5.23) and the Former Shareholder Settlement Payments (subject to the terms of the Former Shareholder Settlement Mechanism) (Plan at Article 5.12), the management of the Liquidating Debtor by a Plan Administrator (subject to certain oversight restrictions prior to the dissolution of the Committee) (Plan at Articles 5.4, 5.14), and the rights of the Liquidating Debtor and the Committee to prosecute, investigate, liquidate and/or settle for Retained Claims and Defenses and Avoidance Actions for the benefit of the Estate (Plan at Articles 5.7, 5.7). Article V of the Plan also contains provisions governing the allowance, distribution and payment of Claims (Plan at Articles 5.19, 5.20), the establishment of reserves for Disputed Claims (Plan at Article 5.21), the Reserved Claims Pool Account and the Claims Reserve Account (Plan at Article 5.9) and procedures governing the payment of Plan Expenses (Plan at Article 5.17). Article V of the Plan also provides for the terms and conditions of settlements with Former Shareholders in exchange for the Former Shareholder Settlement Payments (Plan at Article 5.12), delineates the power and authority of the Committee as

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 08-32514    Doc# 1153    Filed: 05/25/10    Entered: 05/25/10 14:07:51    Page 69 of 80
SF 68685-001\DOCS_SF:67477.20
64
DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

000069

of the Effective Date (Plan at Article 5.14), fixes procedures for the post-Effective Date employment and compensation of Professionals (Plan at Article 5.33) and provides for the entry of a final decree closing the Debtor's chapter 11 case following the payment (or reserve for the payment) of Claims to be paid on or after the Effective Date (Plan at Article 5.34).

### E.    <u>Executory Contracts.</u>

Article VI of the Plan sets forth procedures governing the assumption and rejection of the Debtor's executory contracts and unexpired leases. The Plan provides that, on the Effective Date, the Debtor will reject each of the Rejected Contracts except for any Assumed Contracts identified on Exhibit A to the Plan. The Debtor reserves the right to make additions to Exhibit A to the Plan up to 10 days prior to the date on which objections must be filed to the Plan with respect to the Confirmation Hearing. The Liquidating Debtor shall satisfy any Cure Obligations for the Assumed Contracts by making a Cash payment equal to the lesser of the amount: (a) set forth on Exhibit A to the Plan, (b) set forth in any other notice, motion or supplement to the Plan filed and served in connection with the Confirmation Hearing or as may be determined in an Assumption and Cure Order, or (c) agreed to in writing between the Liquidating Debtor and the non-debtor parties to such contracts or leases. Attached hereto as **Exhibit E** is a schedule of proposed Cure Obligations. The Liquidating Debtor shall satisfy the Cure Obligations within ten (10) days from the date from which an Assumed Contract is assumed pursuant to section 365(b) of the Bankruptcy Code. The Plan also addresses the treatment of the Debtor's postpetition executory contracts and agreements and provides for the Liquidating Debtor's assumption of the Debtor's Continuing Employee Benefit Plans.

### F.    <u>Conditions to Confirmation of the Plan.</u>

Article VII of the Plan provides a list of conditions that must occur in order for the Plan to be confirmed. In addition, the Plan identifies conditions to the effectiveness of the Plan.

### G.    <u>Effects of Confirmation.</u>

Article VIII of the Plan sets forth certain effects of Confirmation of the Plan and the parties that will be bound by the Plan, once confirmed. As noted above, the Plan provides for the revesting of Estate Assets in the Liquidating Debtor. The Plan further provides that all Unsecured Claims

against the Debtor or the Estate shall be of no further force or effect except with respect to the rights of holders of Allowed Claims to receive payments or distributions as set forth in the Plan. The Plan also sets forth certain injunctive provisions that will go into effect on the Effective Date (Plan at Article 8.3) and provides for the limitation of certain liabilities for certain parties (Plan at Article 8.4).

### H. Sources of Funding for the Plan.

The Liquidating Debtor will be capitalized with Available Cash, the Former Shareholder Settlement Payments and the proceeds of the Exit Financing. In addition, Class 6 Insured Malpractice Claims shall be fully satisfied from the proceeds of any applicable Malpractice Policy. With respect to the Exit Financing, provided that the Plan is confirmed, Heller Ehrman (California), on its own behalf and as agent on behalf of the other Heller Ehrman PCs, shall lend to the Debtor $3,000,000.00 as Exit Financing, plus additional amounts as the parties may thereafter agree based on the needs of the Debtor's Estate and the resources of the Exit Financing Lender. The Exit Financing shall accrue interest at 5% per annum, simple interest, and will be secured by a first priority security interest in the Debtor's claims against Bank of America and Citibank. Payment of principal and interest shall be deferred for a period of three years, and the entire obligation may be cancelled upon the occurrence of certain conditions. Repayment of the Exit Financing is subordinate to: (a) the pre-existing liens of Bank of America and Citibank; (b) Administrative Claims in the Chapter 11 Case; and (c) the attorneys' fee lien or claims of attorneys retained to pursue the Debtor's claims against Bank of America and Citibank to the extent of attorneys' fees attributable to the recovery on such claims (but not on claims against entities other than Bank of America or Citibank). Notwithstanding any other terms, the Exit Financing shall become due and payable upon the occurrence of any of the following: (a) conversion of the Debtor's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; (b) the appointment of a trustee; (c) dismissal of the Chapter 11 Case; or (d) the filing of a motion or adversary proceeding challenging the validity of the lien

granted to the Exit Financing Lender which is not dismissed or withdrawn within 20 days of its filing. Additional terms are set forth in the term sheet attached to the Plan as **Exhibit H**.[4]

Upon the Effective Date, the Exit Financing shall become an obligation of the Liquidating Debtor, subject to the exact same terms and conditions as those imposed upon the Debtor and its property by the Exit Financing documents, without altering or affecting the Exit Financing Collateral. Notwithstanding Confirmation, no further steps need be taken by the Exit Financing Lender to maintain the perfection or priority of its lien position with respect to the Exit Financing Collateral after the Effective Date.

### I. Post Effective Date Employment and Compensation of Professionals.

After the Effective Date, the Plan Administrator may retain any existing Professionals of the Committee or the Debtor without further employment agreements or orders. Additionally, after the Effective Date, the Plan Administrator may hire other professionals without the requirement that such professionals file employment applications for Bankruptcy Court approval of their employment, whether on an hourly, contingency fee or other basis, and without requirement that such professionals file applications for payment of post-Effective Date fees and expenses on an interim basis; provided, however, that no less frequently than every 180 days, such post-confirmation professionals, and the Plan Administrator shall file Post Confirmation Motions and Opportunity for Hearings seeking final approval of their respective fees and expenses as previously invoiced or paid on an interim basis, as the case may be. Such applications need not be in the format required by the Local Rules of the Bankruptcy Court or the United States Trustee's Guidelines, but shall be sufficiently detailed to identify the hours worked, the rates charged and the work performed. In the case of fees or expenses paid on a basis which is not by billable hours, the application shall include such other, sufficiently specific information so that the Bankruptcy Court can otherwise determine the reasonableness of such fees and expenses. The Court may *sua sponte* make determinations and rulings with respect to the reasonableness of any specific fee request whether an objection is filed and/or a hearing is held or not.

---

[4] The Debtor shall provide copies of the Exit Financing documents to the Bankruptcy Court, counsel to Bank of America and Citibank, the Office of the United States Trustee and counsel to the Creditors' Committee prior to the Confirmation Hearing.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

000072

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

J.      **Certain Death Benefits.**

Seventeen retired Former Shareholders allege Claims for benefits in connection with their allegedly vested rights under the Heller Ehrman Retirement System, including a claim for a death benefit of $75,000 payable upon the death of such Former Shareholders.  The seventeen retired Former Shareholders have further alleged that their death benefit Claims must be honored and ride through the bankruptcy due to the operation of Bankruptcy Code Section 1114.  The Debtor disputes these Claims and, in particular, whether the death benefit claims must ride through.  However, in the event that it is determined that a retired Former Shareholder is entitled to the benefits of Section 1114 with respect to its death benefit Claim, then such death benefits shall be paid in accordance with the Retirement System documents upon the death of each such retired Former Shareholder or, in the case of the individual who died pre-petition, promptly upon the allowance of his Claim.

K.      **Section 105 Injunction.**

If the Plan is confirmed without modification, on the Effective Date, and except as otherwise provided by the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtor or the Debtor's estate that arose prior to the Effective Date will be permanently enjoined from taking legal action against the Debtor or the Liquidating Debtor for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any Claim or demand against the Debtor or the Liquidating Debtor.  In addition to the foregoing, Bank of America and Citibank and their successors and assigns shall be temporarily enjoined pursuant to Bankruptcy Code section 105 from taking legal action against any Settling Former Shareholder for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand against Settling Former Shareholder predicated in whole or in part on Settling Former Shareholder's former employment or shareholder status with the Debtor or any of the Heller Ehrman PCs, with such injunction to remain in effect until the final resolution of the Bank of America Preference Action, whether by settlement or judgment no longer subject to any pending or possible appeal.

Case: 08-32514    Doc# 1153    Filed: 05/25/10    Entered: 05/25/10 14:07:51    Page 73 of 80
68665\001\DOCS_SF:67678.20                                   DISCLOSURE STATEMENT IN SUPPORT OF
                                                             JOINT PLAN OF LIQUIDATION

000073

# VI.

## TAX DISCLOSURE

Implementation of the Plan may have federal, state, local and foreign tax consequences to the Debtor, Creditors and Interest Holders. No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan, and the following disclosure (the "Tax Disclosure") does not constitute and is not intended to constitute either a tax opinion or tax advice to any person. Rather, the Tax Disclosure is provided for informational purposes only.

Moreover, the Tax Disclosure summarizes only certain of the federal income tax consequences under the Internal Revenue Code of 1986, as amended ("IRC") associated with the Plan's implementation, and does not attempt to comment on all such aspects of the Plan's implementation. In addition, certain of the federal income tax consequences described in the Tax Disclosure are dependent on factual determinations that are subject to uncertainties. Similarly, the Tax Disclosure does not attempt to consider any facts or limitations applicable to any particular creditor or interest holder which may modify or alter the consequences described below. The Tax Disclosure also does not address state, local, or foreign tax consequences or the consequences of any federal tax other than the federal income tax. No assurance can be given that legislative, judicial, or administrative changes will not be forthcoming that would affect the accuracy of the discussion below. Any such changes could be material and could be retroactive with respect to the transactions entered into or completed prior to the enactment or promulgation thereof. Finally, the tax consequences of certain aspects of the Plan are uncertain due to a lack of applicable legal authority and may be subject to judicial or administrative interpretations that differ from the discussion below. The discussion contained in this Tax Disclosure is not binding on the IRS or any other governmental tax authority.

Creditors, therefore, are advised to consult with their own tax advisors regarding the tax consequences to them of the transactions contemplated by the Plan, including federal, state, local, and foreign tax consequences.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

### A. Tax Consequences to the Liquidating Debtor

As noted above, on the Effective Date, the Heller Ehrman PCs will own the Liquidating Debtor through the retention of their Interests in the Debtor, and all Estate Assets shall vest in the Liquidating Debtor free and clear of all Liens, Claims and Interests. The Liquidating Debtor shall comply with its tax reporting and filing obligations with governmental authorities, as appropriate and proper under various tax laws and regulations to which it is subject. The Heller Ehrman PCs may recognize income or loss from the operations of the Liquidated Debtor.

### B. Tax Consequences To Creditors

Pursuant to the Plan, holders of allowed claims will receive distributions of cash in exchange for their allowed claims. Whether and the extent to which such a payment to a creditor holding an allowed claim is includible in the holder's gross income will be determined by reference to the claim in respect of which the distribution is made. The holder may recognize ordinary income in respect of such payment if the claim is in respect of an item generating ordinary income, such as wages, to such holder. Similarly, if a claim is held as part of a trade or business, the holder of such claim may recognize ordinary loss to the extent that such holder's adjusted basis in the claim exceeds the amount received by such holder with respect to such claim. If a claim is held in respect of a capital asset, the holder may recognize a capital gain or loss. However, any distribution attributable to accrued but unpaid interest may be treated as ordinary income, regardless of whether the origin of the claim is capital in nature or whether gain or loss is otherwise recognized on the Claim.

EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE CONSEQUENCES FOR SUCH CREDITOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

### C. Tax Consequences to Holders of Interests

Pursuant to the Plan, Interests will be retained on the Effective Date. However, it is anticipated that each holder of Interests shall receive no distribution or any other consideration on account of such Interests. In general, assuming that a holder has not previously treated the Interests as worthless for tax purposes, the holder should recognize loss equal to the difference between the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   amount of consideration received by such holder (in this case, none) and the adjusted tax basis in the

2   Interests of such holder.

3       EACH HOLDER OF AN INTEREST IS URGED TO CONSULT WITH ITS OWN TAX

4   ADVISOR REGARDING THE CONSEQUENCES OF THE TRANSACTIONS

5   CONTEMPLATED BY THE PLAN.  THE FOREGOING IS INTENDED TO BE ONLY A

6   SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF

7   THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX

8   PROFESSIONAL.  THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX

9   CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN.

10  SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL

11  CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST.  ACCORDINGLY,

12  EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH

13  HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL

14  INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

15                                  **VII.**

16                      **LIQUIDATION ANALYSIS**

17      Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the

18  Plan by an impaired Class, the Proponents must demonstrate, and the Bankruptcy Court must

19  determine, with respect to such Class, each holder of a Claim or Interest will receive property of a

20  value, as of the Effective Date of the Plan that is not less than the amount that such holder would

21  receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date

22  of the Plan. This requirement is commonly referred to as the "Best Interests Test."  For the reasons

23  set forth below, the Proponents submit that they easily satisfy the "Best Interests Test" and therefore

24  should be approved.

25      As the Liquidation Analysis attached hereto as **Exhibit D** demonstrates, the Debtor estimates

26  that in a Chapter 11, General Unsecured Creditors will receive a dividend of 50% on Allowed

27  Claims where as a Chapter 7 dividend would be only 39%.  The Proponent believe there are a

28  number of reasons why the recovery to Creditors would be reduced in a Chapter 7 liquidation.  First,

DOCS_SF:67470.20    DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

000076

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the $3,000,000.00 Exit Financing facility would have to be repaid upon conversion, leaving the Estate with 3,000,000.00 fewer dollars (plus accrued interest) with which to fund litigation and/or make early distributions.[5] Second, even if a chapter 7 trustee could realize recoveries from the Estate's claims against Former Shareholders and other causes of action, the Chapter 7 trustee would be entitled to seek a sliding scale commission of up to 3% of the funds distributed by such trustee to Creditors. Based on projected recoveries, the Debtor estimates that the chapter 7 trustee's fee could be as high as $2,182,000.[6] Thus, even if a chapter 7 trustee were able to achieve the same results, Creditors would probably recover less because the trustee would be entitled to a portion of the proceeds as a commission. Although under Bankruptcy Code section 326, the trustee's compensation is capped by this sliding scale, and the trustee should be required to demonstrate the reasonableness of his or her commissions in relation to work actually performed or results obtained, the Debtor cannot predict whether the trustee would seek or obtain a straight commission based solely on distributions or some lesser amount.

In addition, the trustee will likely employ legal counsel and accountants, which would add additional administrative expenses that would be paid ahead of Class 7 General Unsecured Creditors. The Debtor and the Committee already have legal counsel with extensive knowledge of the complexities of this case. The learning curve for the trustee, new counsel, and the new staff that would likely need to be hired due to the attrition caused by the appointment of a trustee, would simply increase expense and reduce the recoveries to Creditors. The Debtors estimate that trustee's professionals would cost approximately $2,180,000.00 and that the cost to get a new chapter 7 staff up to speed would be approximately $213,000.00 more than projected, post-Confirmation staffing costs in Chatter 11.[7] Finally, the Debtor, its staff and its advisors have been working diligently to settle a number of matters that may result in substantial recoveries to the Estate, and believe that a chapter 7 trustee might not be able to realize on these assets. For example, the Debtor's equity in

---

[5] The Proponents believe it is likely the Exit Financing will not have to be repaid under the terms of the Exit Financing documents. Accordingly, this adjustment is reflected on the line item for "Cash-Unrestricted" in the Liquidation Analysis.

[6] This adjustment is reflected on the line item for "Trustee Fees Under Chapter 11" in the Liquidation Analysis.

[7] These adjustments are reflected in the Liquidation Analysis on the line items for "Trustees Professionals Under Chapter 11" and "Staffing Costs" respectively.

SF 68851-001\DOCS_SF:67672.20
DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION
000077

MPC is valued in the Liquidation Analysis at $4,000,000. The MPC Equity is an asset that is difficult to value because there are conditions to MPC's obligation to repurchase it and because any repurchase of the MPC Equity is likely to be on terms that include payment over time. The Proponents believe that it is unlikely a chapter 7 trustee would be able to realize a similar value for the asset.

Because the Plan implements the priorities set forth in the Bankruptcy Code, each Creditor will receive under the Plan proposed by the Debtor property of a value that is not less than the amount such Creditor would receive in a chapter 7 case. The Plan proposed by the Debtor presents a better alternative to Creditors than a chapter 7 liquidation because the Plan provides a substantial recovery of Unsecured Claims.

## VIII.

## RISK ANALYSIS

The Plan is conditioned on the Liquidating Debtor's fulfillment of its responsibilities under the Plan and the Bankruptcy Court's confirmation of the Plan. Although the Debtor currently expects that all of the transactions required under the Plan shall be consummated, there is always a risk that an unforeseen development could affect either the confirmation or the implementation of the Plan or affect the transactions contemplated under the Plan after confirmation. In addition, the Plan contains several conditions precedent to the confirmation of the Plan and it is possible that one or more of these conditions may not be satisfied. Finally, while the Debtor believes that the Plan satisfies all of the confirmation requirements under section 1129 of the Bankruptcy Code, there is no guarantee that the Bankruptcy Court will concur with this analysis and necessarily confirm the Plan. In addition, recovery by Creditors is tied, in part, to the Debtor's recovery from the Former Shareholders pursuant to the Former Shareholder Settlement Mechanism, as well as to the proceeds of Retained Claims and Defenses and Avoidance Actions, which amounts are presently unknown. Thus, the recovery by Creditors may vary based upon the collections to be used to fund payments to Creditors under the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

000078

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# IX.

## FEASIBILITY

Section 1129(a)(11) of the Bankruptcy Code requires a finding that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. As is set forth on the Debtor's Sources & Uses of Cash at Confirmation attached hereto as **Exhibit C**, the Debtor will have sufficient cash on hand to meet all of the Debtor's Effective Date obligations under the Plan. In addition, the Debtor's Post-Confirmation Budget (attached hereto as **Exhibit B**) establishes that the Debtor will have adequate cash flow to fund its obligations under the Plan thereafter. Accordingly, the Plan proposed by the Proponents satisfies the requirements of Section 1129(a)(11)and is "feasible."

# X.

## CONFIRMATION OF THE PLAN

The Proponents will seek confirmation of the Plan at the Confirmation Hearing, pursuant to applicable provisions of the Bankruptcy Code. If the Plan is not confirmed by the Bankruptcy Court and consummated, the alternatives include (i) liquidation of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code; or (ii) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code. If the Plan is not confirmed, the Proponents will decide which alternative to pursue by weighing each of the available options and choosing the alternative or alternatives that are in the best interests of the Debtor, its Creditors and other parties in interest. However, the Proponents believe that the Plan, as proposed, provides the greatest possible return currently available for the holders of Claims in this chapter 11 case.

///

///

///

Case: 08-32514    Doc# 1153    Filed: 05/25/10    Entered: 05/25/10 14:07:51    Page 79
of 80    74
SF:67497.29    DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

000079

# XI.

## RECOMMENDATION AND CONCLUSION

Based on the foregoing, the Proponents believe that the Plan is in the best interests of Creditors and urge Creditors to vote to accept the Plan.

Dated: May 21, 2010            HELLER EHRMAN LLP

By    */s/ Peter J. Benvenutti*
        Peter J. Benvenutti
        Chair of the Dissolution Committee

Dated: May 21, 2010            THE OFFICIAL COMMITTEE OF UNSECURED
                                        CREDITORS

BY:   BREF 333, LLC

By    */s/ Theresa A. Hoyt*
        Theresa A. Hoyt, its Authorized Signatory,
        as the Chair of the Committee

Dated: May 21, 2010            PACHULSKI STANG ZIEHL & JONES LLP

By    */s/ John D. Fiero*
        John D. Fiero
        Attorneys for Heller Ehrman LLP, Debtor and
        Debtor in Possession

Dated: May 21, 2010            FELDERSTEIN FITZGERALD WILLOUGHBY
                                        & PASCUZZI LLP

By    */s/ Thomas A. Willoughby*
        Thomas A. Willoughby
        Attorneys for The Official Committee of
        Unsecured Creditors

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA